UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                   :      **OPINION DENYING AND**

 :      **GRANTING MOTIONS**

IN RE WORLD TRADE CENTER     :      **FOR JUDGMENT ON THE**

DISASTER SITE LITIGATION      :      **PLEADINGS AND FOR**

 :      **SUMMARY JUDGMENT**

 :

 :      21 MC 100 (AKH)

 :      03 Civ. 00007 et al. (AKH)

-------------------------------------------------------x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        It took ten months to remove the debris that resulted when the terrorists crashed their hijacked airplanes into the Twin Towers of the World Trade Center on September 11, 2001.  Thousands of workers converged on the site, toiling day and night, seven days a week until they completed their jobs.  They risked their lives from shifting debris, fires, smoke, and acrid and polluted air to complete their work in record time, in an extraordinary effort to close the gaping hole caused by the terrorists to the landscape and psyche of New York and the nation.

        I consider in this Opinion the claims of approximately 3,000 of these workers, claiming permanent injury to their respiratory systems and their health and vitality, and a shortening of their lives.  They claim that the City and its contractors, and other Defendants, were negligent in monitoring the air and assuring appropriate safety in the workplace, particularly in not providing adequate respiratory equipment, and assuring proper use thereof.

        Defendants now move to dismiss these claims, contending that they are immune from suit pursuant to state and federal laws providing immunity for actions undertaken in response to a disaster created by an enemy attack on the state and nation.

Plaintiffs argue that Defendants are not immune, particularly in light of Congress' clear contemplation, in the Air Transportation Safety and System Stabilization Act of 2001, that the City was exposed to numerous claims resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001, and granting to the City a cap to limit its potential liability stemming from such claims.  Furthermore, Plaintiffs argue, Congress again recognized the City's exposure to suits such as those at bar by granting a one billion dollar fund to the City to pay for the City's losses, liabilities and expenses, enabling the City to create a captive insurance fund to insure its exposure.

I discuss the various motions of the City and other Defendants in this Opinion and hold that the Defendants are benefited by limited immunity, limited according to time and activity, and that the issues are fact-intensive and cannot be decided on motion at this juncture.  My conclusion also expresses some suggestions for the future progression of these cases, to enable the parties to begin discussions of settlements and to prepare for trial.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 4

II. THE FACTUAL BACKGROUND .......................................................................... 5

A. The Declarations of Emergency:  The Immediate Government Response ................. 7

B. The City Asserts Control and the Recovery Operation Commences .......................... 10

C. The Development of Health and Safety Standards at the Site ..................................... 13

D. The Implementation and Enforcement of Health and Safety Standards ..................... 16

E. The Role of Federal Agencies ...................................................................................... 19
1.      The Activation of Federal Assistance ................................................................. 19
2.      The Role of the Occupational Safety and Health Administration ....................... 21
3.      The Role of the Environmental Protection Agency ............................................. 23
4.      The Role of the Army Corps of Engineers ......................................................... 25

F. The Rescue and Recovery Effort Comes to a Close .................................................... 26

G. The Continuing Vitality of Applicable Safety Standards and Labor Laws ................ 27

2

**III. THE PROCEDURAL BACKGROUND AND THE PENDING MOTIONS** ............................ **28**

A. The Procedural Background.................................................................................. 28

B. The Pending Motions ........................................................................................... 32

**IV. THE PREEMPTIVE EFFECT OF THE ATSSSA** ................................................. **36**

A. The Doctrine of Preemption................................................................................. 37

B. The Alleged Preemptive Effect of the ATSSSA and the Captive Insurance Fund ..... 39

C. Discussion ............................................................................................................ 41

**V. THE MOTIONS FOR JUDGMENT ON THE PLEADINGS—STATE IMMUNITY** ............... **44**

A. The Standard of Review....................................................................................... 44

B. The New York State Defense Emergency Act ..................................................... 45
1.   The Immunity Provision of the SDEA......................................................... 46
2.   The Continued Vitality of the SDEA............................................................ 47
3.   Qualifying Laws under the SDEA ................................................................ 49
4.   Civil Defense Activities and the Requirement of Good Faith ..................... 52
a.   *Civil Defense Activities* ............................................................................... 52
b.   *The Requirement of Good Faith* ................................................................. 53
c.   *Discussion* ................................................................................................... 56

C. The Argument of Immunity Under the New York Disaster Act................................. 61
1.   The Limited Scope of the Disaster Act's Application ................................. 62
2.   The Extension of Disaster Act Immunity to Non-Government Actors ............... 65

D. New York State Common Law Immunity ................................................................ 66

**VI. THE MOTIONS FOR SUMMARY JUDGMENT—FEDERAL IMMUNITY** ........................ **67**

A. Standard of Review............................................................................................... 67

B. Derivative Federal Immunity ............................................................................... 68
1.   The Relevant Case Law ............................................................................... 69
2.   Application to the Rescue and Recovery Efforts at Ground Zero ...................... 74

C. Stafford Act Immunity ......................................................................................... 80

D. Other Bases for Federal Immunity....................................................................... 82

**VII. THE MOTIONS BY THE LESSEES** .................................................................. **83**

A. The Work Performed by the Lessee Defendants ....................................................... 84
1.   The Work Performed by Con Edison.............................................................. 84
2.   The Work Performed by the Silverstein Defendants ........................................ 86

B. Plaintiffs' Supplemental Submissions..................................................................... 87

C. Alleged Grounds of Liability ................................................................................. 89
1.   Dismissal of Claims Pursuant to New York Labor Law for Failure to Show the
     Necessary Degree of Ownership or Control .................................................... 90
2.   Dismissal of Claims Sounding in Negligence in the Absence of Any Duty Owed
     ........................................................................................................................ 95

3.      Dismissal of all Remaining Claims for Failure to Show any Underlying Claim.. 97

**VIII. CONCLUSION .......................................................................................................... 97**

## I. INTRODUCTION

The terrorist attacks of September 11, 2001 inflicted a gaping wound on the structure and spirit of New York City.  But it did not defeat the City, nor its population.  As the nation began to absorb the enormity of the devastation and loss of lives that resulted from the terrorist attacks, an army of responders—instrumentalities of federal, state and city governments, private contractors, and thousands of firemen, policemen, paramedics, and construction workers—descended on the site of the devastation in New York City, initially to participate in the desperate search for survivors and, after all hope of life had faded, to assist in the recovery of remains and the clearing of debris.  Working night and day, seven days a week, overcoming intense heat, persistent fires, and noxious fumes, the work was done and the site was cleared, in just under ten months—record time.

The extraordinary efforts of the men and women who worked on the site took a toll.  A few have died, with at least one of their deaths having been attributed to the poisons they breathed while looking for survivors and clearing the debris.  Anthony DePalma, Debate Revives as 9/11 Dust is Called Fatal, N.Y. Times, April 14, 2006, at B2.  Many others allege serious respiratory injuries, threatening to shorten their lives and afflict their remaining years.  Anthony DePalma, Illness Persisting in 9/11 Workers, Big Study Finds, N.Y. Times, Sept. 5, 2006, at A6.  A study released by doctors at Mount Sinai Medical Center shows that approximately 70 percent of the 10,000 workers who were tested reported that they suffer from new or substantially increased respiratory

problems since September 11.  Id.  In all, more than 3,000 of these men and women have

filed suit in this Court, and even more suits are likely as respiratory injuries continue to

manifest themselves.  Under procedures outlined in the New York General Municipal

Law section 50-e, allowing for leave to serve notice of claims upon the City of New York

outside of the prescribed 90-day period, hundreds of additional persons have gained leave

by the New York Supreme Court also to file suits, adding to the lawsuits consolidated

before me.  Abdelrehim v. City of New York, 2006 WL 2193044 (S.D.N.Y. Aug. 3,

2006).

   The main Defendant in these lawsuits is the City of New York.  The

City's Department of Design and Construction coordinated all the work on the site,

drawing on the expertise of other City agencies, for example, the City Office of

Emergency Management, and of the federal and state governments.  The Port Authority

of the States of New York and New Jersey, the owner of the World Trade Center site,

also had a role, and it, too, is named as a Defendant.  The site was divided into quadrants,

and in each, a general contractor and numerous subcontractors undertook the work; they

also are Defendants.  Finally, various entities with a property interest in buildings at and

around the World Trade Center site, namely Verizon Communications, Consolidated

Edison, the Silverstein Entities and the Westfield Entities, are named as Defendants.

## II.  THE FACTUAL BACKGROUND[1]

The devastation wrought by the terrorist attacks of September 11, 2001 was unimaginable.  One and Two World Trade Center, once great symbols of the City's economic strength and vitality, came crashing down, consuming and entombing the remains of almost 3,000 people who were caught inside the buildings.  Three World Trade Center, Four World Trade Center, and Six World Trade Center sustained extensive fire damage.  Seven World Trade Center caught fire from the falling debris of the Twin Towers and, after burning unimpeded for several hours, also collapsed.  See In re September 11 Property Damage and Bus. Loss Litig. (Aegis Ins. Serv. v. The Port Authority), 2006 WL 62019 at *1 (S.D.N.Y. Jan. 12, 2006) (hereinafter 7WTC).  The shopping malls and parking lots beneath the World Trade Center complex sustained massive structural damage and partial collapse.  The World Financial Center and the glass enclosure of its "Winter Garden," the Verizon Building at West and Vesey Streets, the Deutsche Bank Building at 90 West Street, the St. Nicholas Church at Barclay and West streets, and 125 Cedar Street also sustained extensive damage.

Rescue and recovery workers, and the contractors and government agencies overseeing their efforts, were faced with the daunting task of conducting an emergency response in a hellish setting: a smoldering pile of twisted and entangled shapes of rods and beams towering over twelve stories high and weighing more than one

---

[1] Defendants move for judgment on the pleadings, Fed. R. Civ. P. 12(c), and for summary judgment, Fed. R. Civ. P. 56.  In determining motions for judgment on the pleadings, I am limited to consideration of the facts as alleged in the parties' pleadings and thus may not consider matters outside of the pleadings.  For the limited purposes of this Opinion, however, and in the interest of providing as fully-developed a factual record as possible, I refer to the exhibits submitted in support of and in opposition to the motions for summary judgment on the basis of federal immunity in setting out the facts that are generally applicable to this decision.  I recognize that this is not the ordinary course, but believe that such a complete record is warranted in a case such as this that carries with it unique and important public policy considerations.  Reliance on documents and matters outside of the pleadings should not be considered as a conversion of the motions for judgment on the pleadings to motions for summary judgment.

and half million tons, harboring fires within and emanating clouds of noxious dust and

vapors.  The fires took three months to go out, until December 2001.  Conditions were

further exasperated by the nature of the various substances present at the site.  Thousands

of tons of hazardous materials were released into the air of lower Manhattan, including

asbestos, lead, mercury, cadmium, polychlorinated biphenyls ("PCBs"), benzene, and

chromium, among others, creating a mixture of toxic gases and ultra-fine particles never

before experienced on such a scale.  As Plaintiffs' Master Complaint alleges:

> asbestos, lead, and mercury from such items as personal computers, main
> frame computers, and copy machines; mercury from florescent lights;
> plastics, polyvinyl chloride insulations of cables, nylon carpeting, and
> other materials containing and/or producing dioxins and other harmful
> materials when burned; benzene from the jet fuel and other petroleum
> products stored in the towers; lead ammunition from the on-site Secret
> Service shooting range; and arsenic, lead, mercury and chromium stored in
> the U.S. Customs Laboratory.

(Pls.' Master Compl. ¶ 376, dated Aug. 19, 2005.)

In the initial days following the attacks of September 11, the primary

focus of all at the site was rescuing any potential survivors.  In re World Trade Center

Disaster Site Litig. (Hickey v. Port Authority of N.Y. & N.J.), 270 F. Supp. 2d 357, 372

(S.D.N.Y. 2003); aff'd in part, dismissed in part by McNally v. The Port Authority, 414

F.3d 352 (2d Cir. 2005) (hereinafter Hickey).  Unfortunately, there were too few and, by

September 29, 2001, all hope of finding lives having faded, the search for survivors

closed, and efforts turned to "demolition of the ruined structures of the Towers, removal

of thousands of tons of debris, and cleanup of the World Trade Center site[.]"  Hickey,

270 F. Supp. at 372.

A.  *The Declarations of Emergency:  The Immediate Government Response*

In the aftermath of the attacks, government leaders at the local, state and federal levels took immediate action to secure physical assistance and funding for the recovery effort at the World Trade Center site.  The Mayor of the City of New York, the Governor of the State of New York, and the President of the United States all declared states of emergency, authorizing and directing government agencies and officials to undertake those measures necessary to assist the City of New York in its process of recovery.

Pursuant to the authority granted him under the Executive Law of New York, N.Y. Exec. Law § 24 (McKinney 2006), the Mayor of the City of New York, Rudolph W. Giuliani, issued a Mayoral Order on September 11, 2001, proclaiming a local state of emergency based on the danger to public safety posed by the attacks.  In declaring a state of emergency, the Mayor directed "the Police, Fire and Health Commissioners and the Director of Emergency Management to take whatever steps are necessary to preserve the public safety and to render all required and available assistance to protect the security, well-being and health of the residents of the City."  Proclamation of a State of Emergency, Mayor Rudolph W. Giuliani (September 11, 2001).  In subsequent proclamations, and pursuant to Executive Law section 24(1)(g) allowing for suspension of local laws and regulations during states of emergency, the Mayor directed that local regulations governing the leasing of real property to the City be suspended so as to "permit the immediate leasing of office and other space for use by City agencies in order to continue to provide essential services and critical functions of the City." Proclamation of State of Emergency, Mayor Rudolph Giuliani (Sept. 14, 2001).  The Proclamation of Emergency was renewed by Mayoral Order every five days, as mandated

by the Executive Law, throughout the duration of the recovery and cleanup efforts at the World Trade Center site, through the end of June 2002.  See e.g., Proclamation of a State of Emergency, Mayor Rudolph W. Giuliani (Sept. 11, 2001); Proclamation of State of Emergency, Mayor Michael R. Bloomberg (June 29, 2002).

A disaster emergency was also declared for the State of New York by Executive Order of Governor George E. Pataki on September 11, 2001, pursuant to the authority granted him under the New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law ("Disaster Act").  N.Y. Exec. Law §§ 20-29-g (McKinney 2006).  Noting the "unspeakable atrocities" that occurred in New York City, Washington D.C., and Pennsylvania, Governor Pataki "direct[ed] the implementation of the State Disaster Preparedness Plan and authorize[d]," various state agencies to take "all appropriate actions to assist in every way all persons killed or injured and their families, and protect state property and to assist those affected local governments and individuals in responding to and recovering from this disaster, and to provide such other assistance as necessary to protect the public health and safety[.]"  Exec. Order No. 113 of Governor George E. Pataki (Sept. 11, 2001), N.Y. Comp. Codes R. & Regs. tit. 9, § 5.113 (2005).

On September 14, 2001, President George W. Bush, acting pursuant to the National Emergencies Act, 50 U.S.C. §§ 1601-1651 (2006), declared the existence of a national state of emergency "by reason of the terrorist attacks at the World Trade Center … and the Pentagon, and the continuing and immediate threat of further attacks on the United States."  Proclamation No. 7463, 66 Fed. Reg. 48, 199 (Sept. 14, 2001).  The declaration was deemed effective as of September 11, 2001.   The declaration served also to activate the provisions of the Stafford Disaster Relief and Emergency Assistance

Act ("Stafford Act").  42 U.S.C. §§ 5121-5206 (2006).  Pursuant to the Presidential

declaration of a national emergency, the Director of the Federal Emergency Management

Agency ("FEMA"), Joe M. Allbaugh, declared that a national emergency existed in the

State of New York and, in the interest of ensuring the provision of federal assistance,

authorized FEMA "to allocate from funds available for these purposes, such amounts as

[are] necessary for Federal disaster assistance and administrative expenses."  66 Fed.

Reg. 48,682 (Sept. 21, 2001).

*B.  The City Asserts Control and the Recovery Operation Commences*

            The City response began mere moments after the terrorist attacks on New

York City.  American Airlines Flight 11 crashed into One World Trade Center at 8:40

a.m.  By 8:50 a.m. on September 11, the City, initially through the Fire Department, had

established its Incident Command Post and had asserted control over the World Trade

Center complex and the surrounding areas.  The rescue and recovery efforts at the site

were thereafter coordinated through the City Office of Emergency Management

("OEM"), with the Fire Department designated as the incident commander for the site,

and with the City Department of Design and Construction ("DDC") assuming total

control over all aspects of safety, construction, demolition, and cleanup activities at the

site.

            On September 12, 2001, the DDC set up a temporary command center at

Public School IS 89 in lower Manhattan, immediately to the North of the World Trade

Center site, and commenced daily meetings to organize rescue and recovery efforts.  Of

utmost concern to the DDC was securing the World Trade Center site and limiting access

to the area.  Together with other City agencies, including the OEM, the DDC established

stringent protocols determining "not only who would have access to the site, but also how
that access would take place and under what constraints."  (Pls.' Decl. at 11.)  The City
further enlisted the Port Authority of New York and New Jersey (the "Port Authority") to
assist in maintaining the security of the perimeter and to report observed safety protocol
discrepancies.  (Pls.' J.A., Vol. 1, Ex. 8.)

   The City also engaged private contractors for the recovery effort.  On
September 15, 2001, FEMA confirmed that contracts could be awarded without need for
competitive bidding under the emergency conditions existing after September 11.  (Pls.'
J.A. Vol. 4, Ex. 53.)  Requirements for competitive bidding having been waived, and
pursuant to the Declarations of Emergency issued at the City, State and Federal levels,
the DDC engaged Bovis Lend Lease, AMEC Construction Management, Tully
Construction Company, and Turner Construction Company to "provide the work
necessary for removal and demolition services."[2]  (Pls.' Decl. at 6.)  These four
contractors were designated as the City's Primary Contractors and assumed lead roles in
the recovery and cleanup efforts at the site.[3]  (Pls.' J.A. Vol. 8, Ex. 149 (WTC
Environmental Health and Safety Plan dated Oct. 15, 2001).)  The efforts of the Primary
Contractors were coordinated, and supervised, through the DDC at twice daily meetings
held at the temporary command center, and by numerous visits to the worksite.  By
September 14, 2001, the DDC had divided the site into four quadrants with a Primary

---

[2] The work of the Contractors was financed by the City.  At the close of the rescue and recovery efforts,
total payments to the Primary Contractors were in excess of $200 million.

[3] The Primary Contractors in turn entered into subcontracts with dozens of specialty subcontractors needed
to provide all services necessary to completion of the recovery effort.

Contractor assigned as a "construction manager" for each individual quadrant.[4]  The

Primary Contractors acted as supervisors for their individual quadrants, with

responsibility for enforcing applicable regulations and ensuring compliance.

Cognizant also of the need for additional space outside of the World Trade

Center complex to which all debris from the site could be removed and where searches

for evidence and human remains could be conducted, the City re-opened the Fresh Kills

Landfill ("Fresh Kills") on Staten Island.  As debris was cleared from the site, it was

loaded onto barges and transferred by the Department of Sanitation ("DOS") to Fresh

Kills for sorting and further inspection.

The DDC, with the assistance of the Port Authority engineers, regulated

and controlled the removal of debris from the site, and all issues pertaining thereto.

Global Positioning System devices were installed in all vehicles carrying debris from the

site, allowing the City to improve the efficiency of the debris removal process.  All trucks

leaving the site were issued "Load Debris Tickets" containing information about the

destination of the truck and its cargo.  As debris was removed from the site, the DDC

tracked and coordinated the following:  "(a) FDNY/Rescue operations; (b) Structural

concerns; (c) Progress of work; (d) Weather; (e) Trucking/Traffic operations-Manifests;

(f) Safety concerns; (g) Manpower (contractor/CM Staff-site & home office); (h)

Equipment on site; (i) Idle equipment; (j) Material deliveries/usage; and (k) Crane

issues."  (Pls.' J.A. Vol. 1, Ex. 7.)  The DDC further controlled all aspects relating to

---

[4] The Primary Contractors were assigned to the four zones as follows:  Tully Construction (Zone 1), Bovis
Lend Lease (Zone 2), AMEC (Zone 3), Turner Construction (Zone 4).  Two additional quadrants were also
established, covering Piers 6 and 26 and the barging and marine operations (Zone 5) as well as Fresh Kills
(Zone 6).

persons working at the site, from regulating shift changes and meal allowances, to payment and payroll.

In the initial days and weeks following September 11, the City and its Contractors, together with public utilities, worked also to restore essential services to the City.  The September 11 attacks resulted in the immediate loss of power to all of lower Manhattan and in the destruction of critical components of the gas and steam infrastructure.  The Con Edison substations, which had been located directly beneath World Trade Center Seven, were destroyed by fire and by the building's ultimate collapse, resulting in a critical disruption of services to Lower Manhattan.  See 7WTC, 2006 WL 62019 at *7-10.  Con Edison assumed sole responsibility for restoring electric, gas and steam services and related facilities that were damaged or destroyed due to the events of September 11.  The Verizon Building, located at 140 West Street, also sustained severe structural damage, crippling the phone system.  Other critical services, such as the transportation system running through the World Trade Center site, were also destroyed and disrupted.

*C. The Development of Health and Safety Standards at the Site*

Conditions at the World Trade Center site, particularly the hazards posed by the dust and contaminants that enveloped lower Manhattan for weeks following the attacks, posed significant dangers to the rescue and recovery workers.  (Pls.' Decl. at 4.) In the months following September 11, and continuing to the close of operations at the site in June of 2002, the Occupational Safety and Health Administration ("OSHA") reported levels of various contaminants, including dioxin and asbestos, in excess of

OSHA's permissible exposure limits.[5]  The debris pile itself, containing what remained of two 110-story towers of concrete and steel, created its own volatile, unstable, and inherently dangerous worksite.  Implementation and enforcement of viable and responsive health and safety standards was therefore essential.  The workers at the site were presented with a dangerous environment, below and surrounding their work activities, threatening their health and safety.

By September 12, 2001, the City had established itself as the lead entity charged with the development and enforcement of health and safety standards at the site, and had instituted daily meetings with representatives of the Primary Contractors as well as with the FDNY, NYPD, OEM, and OSHA, to organize the rescue and recovery operation.  These meetings would continue throughout the duration of the recovery effort.  At the request of the DDC, Bechtel Environmental Safety & Health ("Bechtel") also began work at the site on September 12, 2001, assisting the City with monitoring compliance with health and safety standards.

Critical to any health and safety plan was the development of appropriate standards for the use of personal protective equipment ("PPE"), including respirators.  Within hours of the collapse, the FDNY advised its employees that respirators should be worn at the site and placed an order for over 5,000 respirators and 10,000 cartridges to

---

[5] A report dated April 12, 2002 indicates that only a fraction of the total 1286 samples showed elevated level of asbestos on the debris field.  (Pls.' J.A. Vol. 4, Ex. 47 ("OSHA Sampling Results Summary as of 4/12/02) at BOVCM3-000002942.)  Other samples, however, showed elevated levels of silica and other compounds, including dioxins.  (Id. at 000002943.)  Nevertheless, as early as October 17, 2001, OSHA assured the DDC that "[a]ll DDC personnel should feel confident that they are not being exposed to unhealthy levels of chemicals and that air quality around the WTC is generally good."  (Pls.' J.A. Vol. 4, Ex. 67.)  OSHA continued to recommend the use of respirators.  (Id.)

provide its employees with the necessary respiratory protection.[6]  The FDNY also

ordered adapters to convert 15,000 "Scott" facemasks, designed for use with self-

contained breathing equipment, to be used instead with filter cartridges.  The City was

also focused on establishing appropriate PPE standards at the site and, by September 21,

2001, plans were in place to:

> Develop the job and site specific PPE requirements (DDC); Develop and
> distribute a list of required PPE to all site emergency response and
> workers, including posters for staging areas (DDC); Provide respirator fit-
> testing, maintenance and use information, and comprehensive technical
> support (NYCDOH); Aggressively promote minimum PPE use in all areas
> where highest exposures may occur (NYCDOH, NYPD, FDNY, National
> Guard).

(Pls.' Timeline at 2.)

The DDC, together with the New York City Department of Health ("City

DOH"), assumed primary responsibility for developing and enforcing PPE requirements,

with each agency at various times proclaiming itself as the lead agency in charge of

worker health and safety.  As a general matter, the DDC assumed responsibility for City

and contractor personnel, while the City DOH assumed responsibility for FDNY and

NYPD personnel.

On September 20 and 22, the City DOH issued criteria for minimum

safety gear to be worn at the site.  Similarly, on September 21, and again on October 19,

the City DOH issued orders mandating the use of specific protective actions to be taken

as personnel and vehicles left the site:

---

[6] However, it was not until September 28, 2001 that a written order was prepared and it was not until
November 26, 2001 that all necessary bureaucratic authorization was given.  On September 22, 2001, the
FDNY complained of the delay, and admonished officials "OEM must develop a plan … to address overall
use & respirator issue[s]."  (Pls.' Decl. at 4.)

> It is hereby ordered that all persons leaving the WTC site shall follow personal hygiene protocols, including but not limited to … removal or HEPA vacuuming of work clothes …
>
> It is further ordered that all vehicles leaving the WTC site be spray washed[.]

(Pls.' J.A. Vol. 5, Ex. 64 (City DOH Order dated Sept. 21, 2001).)  On October 22, 2001, the City DOH issued a directive specifically addressing the use of safety equipment and respirators:

> Personal Protective Equipment Required in Debris Area
>
> -     Hardhat or helmet
>
> ***
>
> -     Respirator (half-face reusable) with P100/organic vapor/acid gas (OVAG) filter cartridges

(Pls.' J.A. Vol. 6, Ex. 97 (Health Bulletin dated Oct. 22, 2001).)

The DDC, together with Bechtel, also played an important role in establishing health and safety protocols, periodically issuing Environmental Health and Safety Bulletins outlining the applicable safety standards in force at the site.  In a Bulletin issued in February 2002, the DDC, after consultation with OSHA representatives, announced its concurrence with the City DOH determination as to minimum respiratory protective equipment:

> A half-face respirator with P-100, organic vapor, acid gas filters/cartridges is required within the confines of the slurry wall and for any activity or area outside the slurry wall that generates dust, fumes or vapors[.]

(Pls.' J.A. Vol. 6, Ex. 93 (February 2002 Environmental Health and Safety Bulletin).)

*D.  The Implementation and Enforcement of Health and Safety Standards*

From as early as September 12, 2001, the DDC, working primarily with Bechtel, the lead contractor in charge of health and safety concerns at the site, and with

the assistance of the Port Authority and the Primary Contractors, began conducting inspections in order to enforce compliance with applicable PPE requirements. Federal agencies, including the Environmental Protection Agency ("EPA") and OSHA, also participated in safety monitoring and assumed a leading role with respect to certain tasks relevant to health and safety monitoring.

By October of 2001, the City had distributed an initial version of its comprehensive Environmental Safety and Health Plan (the "ES&H Plan"), addressing all aspects of worker safety at the site. (See Pls.' J.A. Vol. 6, Ex. 99, 100, 109; Vol. 8, Ex. 149.) Numerous revisions to the Plan would follow. The ES&H Plan operated to define the "minimum acceptable requirements for ensuring workers' safety and health at the World Trade Center (WTC) Emergency Project" and established the hierarchy of responsibility and enforcement. Setting forth its general purpose and the DDC's lead role in its enforcement, the Plan expressly provided as follows:

> This ES&H Plan is directly applicable to all work conducted by agency and prime contractor/subcontractor personnel engaged in any activity associated with the cleanup and recovery efforts on the WTC Emergency Project. The DDC has overall responsibility for the site's ES&H program.

(Pls.' J.A. Vol. 8, Ex. 149.)

The ES&H Plan provided that the DDC had lead responsibility for "Environmental Health and Safety Services," with the City's Primary Contractors also assuming responsibility for enforcing the terms of the Plan. Specifically, the Plan provided that "each prime contractor and their subcontractors are responsible for implementation, enforcement and compliance with all aspects of this plan." (Pls.' J.A. Vol. 8, Ex. 149.) Site monitoring was also performed by other city, state and federal agencies. The results of such monitoring, and all tests setting forth rates of exposure

were to be provided to the City DOH for presentation of a final report to the DDC.

Further, the DDC alone had the authority to stop work in the event of workplace hazards.

Separately from the ES&H Plan, the DDC and FDNY, as co-incident

commanders at the site, together with the Primary Contractors, four separate

employer/employee associations, and OSHA entered into the WTC Emergency Project

Partnership Agreement (the "Partnership Agreement") on November 20, 2001, and which

was subsequently revised on April 10, 2002.  (See Defs.' J.A. Vol. 3, Ex. AO (WTC

Project Partnership Agreement, dated April 10, 2002).)  The Partnership Agreement

affirmed "the value of working in a cooperative, focused and voluntary effort to ensure a

safe and healthful environment for everyone involved," and memorialized the parties'

commitment to "advance the goal of environmental health and safety" and to "share

safety hazard data."

In accordance with the ES&H Plan and the Partnership Agreement, reports

documenting the results of these safety compliance inspections were prepared throughout

the duration of the recovery effort at the direction of the DDC.  The reports prepared by

the DDC, and reports and documents prepared by the Primary Contractors and other

agencies at the site, highlight ongoing and persistent problems with enforcing compliance

with applicable PPE requirements.[7]  Within the first month of initiating operations at the

---

[7] Plaintiffs' timeline indicates numerous problems with enforcing compliance.  (See Pls.' Timeline at 8, 11, 13, 14, 19, 20, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37.)  Such problems are also highlighted in the various exhibits submitted by Plaintiffs in opposition to Defendants' motions for summary judgment.  Within a week of the attacks, Bechtel had noted that "[m]any workers are either not wearing or wearing inappropriate respiratory protection."  (Pls.' J.A. Vol. 6, Ex. 77 (WTC Site Evaluation, Sept. 19, 2001).) An October 18, 2001 report by Bechtel summarized observed safety discrepancies.  (Pls.' J.A. Vol. 6, Ex. 80 (Memo from Mike Burton, dated Oct. 18, 2001).)  Also in October of 2001, the EPA notified the City Department of Health that it had observed "very inconsistent compliance with our recommendations[.]" (Pls. J.A. Vol. 4, Ex. 62 (Letter from Bruce Sprague, EPA, dated Oct. 5, 2001).)  By January 2002, the DDC reported compliance rates with respirator requirements below thirty-percent.  (Pls.' J.A. Vol. 6, Ex.

site, the Primary Contractors, AMEC, Tully, Bovis, and Turner, had all documented
problems with PPE compliance and particularly with respirator use.  Indeed, problems
with respirator usage would pervade the entirety of the recovery operation at the site,
with estimates prepared in January of 2002 showing compliance rates below twenty-nine
percent.

*E.  The Role of Federal Agencies*

      The enormity of the task necessitated the involvement of, and cooperation
with, federal agencies.  Although the City, through the DDC, assumed primary control
over the site, several federal agencies, including FEMA, OSHA, the EPA and the United
States Army Corps of Engineers ("Army Corps"), participated in the rescue and recovery
effort.  (Pls.' J.A. Vol. 4, Ex. 49, FEMA Debris Monitoring Plan ("The City has primary
responsibility for oversight and monitoring.").)  These various agencies would ultimately
play an active role in the efforts at the World Trade Center, most particularly through
their attendance at meetings addressing overall concerns of worker health and safety and
through their assistance in developing and enforcing appropriate health and safety
protocols responsive to such concerns.

    1.  <u>The Activation of Federal Assistance</u>

      On September 14, 2001, President George W. Bush declared a National
State of Emergency, thereby activating the Stafford Disaster Relief and Emergency
Assistance Act ("Stafford Act"), 42 U.S.C. §§ 5121-5206 (2006).  Activation of the
Stafford Act by Declaration of National Emergency allowed for implementation of the

---

103, DDC Memo dated Jan. 3, 2002).)  By February, compliance rates were believed to be at an all time
low.  (Pls.' J.A. Vol. 6, Ex. 106 (Labor Management Site Meeting dated Feb. 20, 2002).)

course of federal assistance provided pursuant to the framework outlined in the Federal

Response Plan ("FRP").  (Defs.' J.A., Vol. 1, Ex. L (the "FRP").)

   The FRP, an agreement among twenty-seven federal agencies, "establishes

a process and structure for the systematic, coordinated, and effective delivery of federal

assistance to address the consequences of any major disaster or emergency declared

under the [Stafford Act]."  (FRP, Ex. L at 1.)  Specifically, the FRP sets forth a "Basic

Plan," presenting "the policies and concept of operations that guide how the Federal

Government will assist disaster-stricken State and local governments."  (Id. at 4.)  The

Basic Plan provides that, upon exhaustion of local resources and at the request of the

affected local government, FEMA shall operate as the lead federal agency for

coordinating an appropriate federal response, providing for both technical and financial

assistance.  (Id. at 7-8, 12.)

   The FRP further coordinates the structure and nature of federal assistance

by grouping the types of federal assistance most likely to be utilized by overwhelmed

state and local governments into twelve separate Emergency Support Functions

("ESFs").[8]  (Id. at 13.)  Each individual ESF is headed by a primary agency "designated

on the basis of its authorities, resources, and capabilities in the particular functional area,"

and assisted by one or more other federal agencies acting in a supporting capacity.  (Id.)

As the lead agency in charge of coordinating any federal response pursuant to a

declaration of emergency, FEMA is authorized to activate "some or all of the ESFs, as

necessary."  (Id.)

---

[8] The twelve ESFs established pursuant to the FRP are as follows: ESF 1 (Transportation); ESF 2
(Communications); ESF 3 (Public Works and Engineering); ESF 4 (Firefighting); ESF 5 (Information and
Planning); ESF 6 (Mass Care); ESF 7 (Resource Support); ESF 8 (Health and Medical Services); ESF 9
(Urban Search and Rescue); ESF 10 (Hazardous Materials); ESF 11 (Food); ESF 12 (Energy).  (FRP, Ex. L
at 14.)

Pursuant to activation of the FRP, and FEMA's subsequent activation of the relevant ESFs, OSHA, the EPA and the Army Corps each provided technical and physical assistance to the City of New York in their respective areas of expertise and authority.  Federal financial assistance was also provided throughout the duration of the recovery effort with FEMA promising to cover the cost of all operations at the World Trade Center Site as well as at Fresh Kills Landfill.  (Defs.' J.A., Vol. 2, Ex. S (Press Release, The White House, dated Sept. 18, 2001).)

2.  <u>The Role of the Occupational Safety and Health Administration</u>

In keeping with its designation under the FRP, OSHA assumed the lead role for developing and enforcing respirator requirements at the site.  Within a few days of the attacks, OSHA had begun working with the City and other local agencies to develop comprehensive and effective PPE requirements and overall worker health and safety protocols.  (Defs.' J.A., Vol. 3, Ex. AC (email from Bob Adams).)  OSHA advised the City that the use of P-100 filters, rather than standard combination filter/cartridges, would provide workers with adequate protections against the respiratory dangers presented at the site.  OSHA also performed atmospheric monitoring throughout the rescue and recovery effort to establish the geographical boundaries within which respirator use would be required and in order to determine the level of respiratory protection needed to protect workers against contamination by the surrounding atmosphere.  (Def. J.A. Vol. 3, Ex. AE (Ryan Dep.) at 144:5-25.)

On approximately September 20, 2001, at the request of the City DOH, OSHA assumed a role as the "lead agency for distributing, fitting, and training for respirators for the recovery of workers."  (Defs.' J.A., Vol. 2, Ex. Q (Clark Dep.) at

87:19-88:6; Pls.' J.A. Vol. 4, Ex. 56.)  OSHA took over the operation of the FDNY's

respirator distribution staging area, ultimately becoming the "sole provider of respiratory

protection equipment, fit-testing and training for new shift FDNY personnel."  (Clark

Dep., Ex. Q at 89:5-25.)  OSHA also distributed respirators to NYPD personnel.  (Id. at

89:5-25.)

    Distribution of respirators and other safety equipment at the site was

coordinated through plywood huts set up by OSHA at various points surrounding the

World Trade Center project.  (Defs.' J.A., Vol. 3, Ex. AE (Ryan Dep.), at 66:14-67:13.)

OSHA ultimately distributed over 131,000 respirators.  (Clark Dep., Ex. Q at 66:7-17.)

All individuals to whom OSHA distributed respirators received qualitative and

quantitative fit-checks, and training for the proper use, storage, and maintenance of

respiratory equipment.  (Id. at 87:19-88:6; 93:19-94:5.)  OSHA also developed a 10-hour

health and safety course focusing on the proper use of respirators.  All individuals who

worked in a supervisory role at the site, including employees of the Primary Contractors,

were required to attend the course prior to being admitted to the site.  (Defs.' J.A. Vol. 3,

Ex. AA ("OSHA's role in Response"); Ex. AJ ("Workers Safety Bulletin #13); Ex. AK

(Weekly EHS Meeting Minutes).)

    OSHA, however, did not assume direct supervisory power to assure that

workers used respiratory equipment consistently and efficiently.  (Pls.' J.A. Vol. 3, Ex.

39, Public Hearing, 326:19-23; Ex. 40, DOH email ("Unfortunately, OSHA has taken an

'advisory' role to date.'").)  OSHA's role was thus one of "assistance and consultation,

**not** enforcement."  (Pls.' J.A. Vol. 4, Ex. 42, OSHA Talking Points (emphasis in

original).)  Even though OSHA deployed over 1,000 inspectors to the site to report safety

violations to the various contractors and to document observed safety violations in weekly reports, the prevalence of violations supported by anecdotal evidence of substantial non-use of PPE suggests that safety standards were not uniformly and consistently enforced.  (Ryan Dep., Ex. AE at 70:5-72:7, 73:8-25, 143:2-6, 191:22-192:25.)  Furthermore, it is not clear if OSHA inspectors had the authority to stop work at the site upon observing critical safety violations.  Per the express terms of the ES&H Plan, the DDC retained exclusive stop work authority.  Nevertheless, Walter Murray of Turner Construction testified that he believed that OSHA also had authority to stop work at the site.  (Defs.' J.A. Vol. 2, Ex. W (Walter Dep.), 229:21-230:10.)  By the close of operations at the World Trade Center site, OSHA had identified more than 9,000 hazards as needing correction.  Defendants ask me to presume that employers had corrected the problems pointed out to them, but it would be improper for me to do so on a Rule 12(c) motion.  (Def.'s J.A. Vol. 3, Ex. AH (OSHA, Inside the Green Line).)  Clearly, problems with enforcing PPE requirements persisted and not OSHA, but the DDC and the private Contractors, were responsible to ensure that compliance at the site would be enforced.

3.   The Role of the Environmental Protection Agency

Under the FRP, the EPA is designated as the lead agency responsible for the cleanup of sites contaminated by "hazardous materials release[s] caused by a catastrophic event."  (Defs.' J.A. Vol. 4, Ex. AS (Hearing Before U.S. Senate Appropriations Committee, Nov. 28, 2001); FRP, Ex. L at TI-13; Vol. 3, Ex. AM (National Contingency Plan, 40 C.F.R. § 300.130(i)).)  As such, the EPA, in conjunction with the City Department of Environmental Protection ("City DEP"), assumed the lead role for "hazardous waste disposal" at the World Trade Center site.  (Defs.' J.A. Vol. 4,

23

Ex. AU (Hearing Before U.S. Senate Committee on Environment and Public Works, Feb.

11, 2001); Vol. 2, Ex. O (Touw Dep.) at 123:13-16, 131:25-132:11; Vol. 4, Ex. AT

("EPA Response to September 11:  Oh My God, Look at that Plane.").)  The EPA further

assumed "primary responsibility for monitoring the ambient air, water and drinking water

and coordinating the sampling data for all the response agencies."  (Defs.' J.A. Vol. 4,

Ex. AU (Hearing Before U.S. Senate Committee on Environment and Public Works, Feb.

11, 2001).)  In accordance with its lead role in environmental monitoring at the site, the

EPA also assumed responsibility for public dissemination of the results of environmental

monitoring tests conducted at the site, regularly publishing such results on its website and

at the tented area where workers ate their meals.  (Defs.' J.A. Vol. 4, Ex. AQ (New York

City Council, Transcript, Nov. 1, 2001) at 24:22-23. ("EPA has taken the lead in making

the data available to the public through our website.").)

        Environmental testing by the EPA was coordinated with OSHA and other

City agencies through the use of multiple ambient air monitors at locations in and around

the World Trade Center site and through the collection of data from pre-existing air

monitors in the area.  (Defs.' J.A. Vol. 4, Ex. AY (WTC Response Activity Situation

Report #5).)  At the close of operations in June of 2002, OSHA had taken over 6,100 air

samples and had turned over the results of these tests to the EPA for further evaluation

and examination.  (Defs.' J.A., Vol. 3, Ex. AA (OSHA's Role in Response and Recovery

Operations).)  Although other City agencies, including the City DOH and the City DEP,

also conducted environmental monitoring at the site, the results of such monitoring were

coordinated through the EPA and shared with the Environmental Assessment Group, a

inter-agency group comprised of federal, state and City agency representatives.  On the

basis of these tests, both the EPA and the Environmental Assessment Group determined

to adopt the rule that all workers be required to wear respirators at all times while

working on the pile.  (Pls.' J.A. Vol. 4, Ex. 62 ("EPA has recommended, and continues to

recommend, that workers at the Site wear respiratory protection.").)

      The EPA thus worked with City and federal agencies to develop adequate

health and safety protocols, but limited its role to monitoring of air quality and removal

of hazardous materials.  Indeed, the EPA expressly acknowledged that it lacked

"authority to enforce the worker health and safety policies for non-EPA/USCG

employees."  (Pls.' J.A. Vol. 4, Ex. 62 ("We have observed very inconsistent compliance

with our recommendations, however, we do not have the authority to enforce the worker

health and safety policies[.]").)

    4.   <u>The Role of the Army Corps of Engineers</u>

      On October 1, 2001, at the request of the City under ESF 3 (Public Works

and Engineering) of the FRP, the Army Corps assumed control over the coordination,

implementation, structure and enforcement of safety and health procedures and protocols

at Fresh Kills.  (Defs.' J.A. Vol. 5, Ex. BH (Office of History, U.S. Army Corps of

Engineers, Fact Sheet).)  Although the Army Corps' role at Fresh Kills was limited as an

initial matter to the development and implementation of health and safety standards for

contractor personnel only, as of October 10, 2001, the scope of its role at Fresh Kills was

expanded to include "the implementation of a comprehensive health and safety plan for

<u>all</u> personnel working at the landfill site."  (Defs.' J.A. Vol. 5, Ex. BJ (Amendment to 3-

COE, Oct. 10, 2001).)

      In accordance with its expanded role at the Fresh Kills Landfill, the Army

Corps identified the following areas for inclusion in a comprehensive health and safety plan: "Establish baseline worker exposure levels for each job site activity; Develop job and site specific PPE requirements; Establish an ongoing worker exposure monitoring program; Issue daily work site air quality updates; Implement dust control measures; Establish the presence of health and safety team monitors." (Defs.' J.A. Vol. 5, Ex. BJ (Memo Re. Amendment to 30COE NAD-39).) To assist in the development and enforcement of such a comprehensive plan, the Army Corps contracted with a private contractor, Phillips & Jordan, to act as the Construction Manager for the Fresh Kills site. Specifically, Phillips & Jordan assumed responsibility for the management of the forensic recovery operation at the site and for the enforcement of the site safety and health plan. (Defs.' J.A. Vol. 5, Ex. BK (Phillips & Jordan Disaster Recovery Group: Experience).) The Army Corps further enlisted the assistance of a subcontractor, Evans Environmental & Geosciences, to develop an Environmental Safety and Health Plan tailored to the concerns presented by the recovery operations at Fresh Kills and to develop and implement necessary training and monitoring programs.

*F. The Rescue and Recovery Effort Comes to a Close*

From the time that the rescue and recovery operation began at the World Trade Center site in the moments following the September 11 attacks, to the close of operations in June of 2002, work at the site never ceased, continuing twenty-four hours a day, seven days a week, including holidays, with the exception only of Veteran's Day 2001. Despite the enormity of the task, however, work progressed at a rate that many could not have imagined and, as early as April of 2002, the transition of control over the site from the DDC to the Port Authority was being designed and implemented.

On May 10, 2002, control over Seven World Trade Center was returned to the Port Authority.  The turnover of control as to the remainder of the World Trade Center complex followed shortly thereafter, on June 30, 2002, with the Port Authority once again assuming complete responsibility for the site.  Although control has officially been returned to the Port Authority, work at the site continues to this day with efforts now turned to the completion of all steps necessary to rebuilding.

*G.  The Continuing Vitality of Applicable Safety Standards and Labor Laws*

Throughout the duration of the rescue and recovery effort, the City agencies and Primary Contractors remained obligated to abide by applicable safety standards and labor laws.

Pursuant to the authority granted under Executive Law section 24, both the Governor of the State of New York and the Mayor of the City of New York had the capacity to suspend, or direct the suspension of, "any of its local laws, ordinances or regulations, or parts thereof subject to federal and state constitutional, statutory and regulatory limitations, which may prevent, hinder, or delay necessary action in coping with a disaster or recovery therefrom[.]"  N.Y. Exec. Law § 24 (McKinney 2006).  Both declined, however, to authorize wholesale suspension of applicable laws and regulations, instead authorizing only the suspension of the sign-in/sign-out procedures required by New York State Labor Law for the period from September 11, 2001 to October 14, 2001. (Pls.' Decl. at 31.)

In the absence of any such suspension of applicable labor laws, the City expressly mandated that its Primary Contractors abide by and enforce all relevant laws, ordinances, and regulations.  Specifically, draft contracts between the DDC and the

27

contractors show that compliance with applicable safety standards was required.  The

DDS mandated compliance with the following:

>    a. New York State Uniform Fire Prevention and Building Code;
>    b. National Fire Prevention Association (NFPA) requirements;
>    c. National Electrical Code (NEC);
>    d. American National Standard – ANSI, A117.1 1986 or current edition
>       (Accessibility and Usability by the Handicapped);
>    e. Occupational Safety and Health Administration (OSHA);
>    f. New York State Department of Labor Rules and Regulations;
>    g. New York State Energy Code;
>    h. Local Codes and Ordinances;
>    i. New York State Department of Health Requirements; and
>    j. New York State Department of Environmental Conservation

(Pls.' Decl. at 30-31; see also Pls.' J.A. Vol. 6, Ex. 110, Revised Draft Contracts with

Primary Contractors, dated Oct. 11, 2001.)

By their pleadings, however, Plaintiffs allege that "non-compliance with

relevant statutes, regulations and ordinances was rampant," with workers being

encouraged in a least some instances to forego filing of complaints for safety violations

so as not to interfere with the recovery operation.  Plaintiffs contend that this failure to

enforce applicable safety standards and the failure to provide adequate and appropriate

respiratory protection resulted in unprecedented exposure to various contaminants and

toxins, and thus gave rise to the respiratory injuries that now plague so many of the

rescue workers.

## III.  THE PROCEDURAL BACKGROUND AND THE PENDING MOTIONS

### A.  The Procedural Background

Indeed, just as the process of recovery and rebuilding began, those who

participated in the efforts that made such recovery possible began to suffer from a host of

respiratory ailments.  In the months following September 11, and continuing until today,

thousands of suits alleging respiratory injuries sustained as a result of violations of various state and federal safety laws and regulations were filed in New York State Court. To date, more than 3,000 cases alleging respiratory injuries have been filed, with thousands more in the offing.  By their Master Complaint dated August 19, 2005, Plaintiffs asserted ten separate claims for recovery.  Counts One and Two asserted claims pursuant to New York Labor Law.  Counts Three and Four asserted claims pursuant to those provisions of the General Municipal Law allowing suits by injured and deceased firefighters and police officers and their representatives.  Count Five stated a claim sounding in common law negligence.  Counts Six and Seven asserted claims for medical monitoring and fear of cancer, respectively.  Count Eight asserted a claim for fraud and misrepresentation.  Count Nine asserted a claim for wrongful death.  Finally, Count Ten asserted a claim on behalf of all derivative plaintiffs.

The Defendants removed the actions to federal court asserting jurisdiction under the Air Transportation Safety and System Stabilization Act ("ATSSSA" or "the Act"), 49 U.S.C. § 40101 note (2006).  The Act provides a federal cause of action for actions for damages "arising out of" the terrorist-related aircraft crashes of September 11 and vests the District Court for the Southern District of New York with "original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001."  ATSSSA § 408(b)(3).  Motions to remand followed.

In determining the scope of federal jurisdiction provided under the Act, and noting the important concerns of federalism counseling against the imputation of a

congressional intent to preempt an entire panoply of state law without a clearly expressed intent to provide such preemption, I held "that claims alleging respiratory injuries suffered at the World Trade Center site, up to and including September 29, 2001, [were] preempted by section 408 of the Act, and that claims incurred after that date or at different sites [were] not preempted."  Hickey, 270 F. Supp. 2d at 374.  Cognizant, however, of the importance of a final determination as to the scope of my jurisdiction under the Act, I certified the order providing for federal jurisdiction for interlocutory appeal, 28 U.S.C. § 1292(b), and stayed the remand of cases not subject to federal jurisdiction pending review by the Court of Appeals.  Id. at 381.

Proceeding on the assumption that federal jurisdiction existed as to all cases coordinated under 21 MC 100 absent a decision to the contrary by the Court of Appeals, I directed that the parties proceed on a limited, albeit extensive, course of discovery, focusing on Defendants' anticipated dispositive defense of immunity under state and federal law and with the aim of establishing a joint offer of proof, alleviating Plaintiffs of the burden of proving all factual averments.  (See Case Management Order No. 3 ("CMO 3"), dated Feb. 7. 2005.)  I ordered further that Plaintiffs file separate claims for each individual claimant, holding that the individual issues relevant to each claimant predominated over common issues.  Thus, as the parties awaited decision by the Court of Appeals, the litigation continued to move forward.

As discovery relevant to the asserted defenses continued, the Court of Appeals delivered its decision.  Although the Court concurred with my finding of jurisdiction as to respiratory injuries sustained at the World Trade Center site in the period between September 11 and September 29, 2001, and with my general proposition

that, by enactment of the Act, Congress did not in fact intend to "displace the entire panoply of state law 'regulat[ing] the health and safety of the workplace,'" McNally v. The Port Authority, 414 F.3d 352, 379 (2d Cir. 2005), the Court expressed in dicta its disagreement with that portion of my Opinion remanding those actions asserting injuries arising at sites other than the World Trade Center and subsequent to September 29. See Id. at 380 ("We need not take the phrase 'relating to' to any metaphysical extreme in order to conclude that it encompasses the claims brought before the district court …, i.e., that airborne toxins and other contaminants emanating from the debris created by the crashes caused respiratory injuries to plaintiffs employed to sift, remove, transport, or dispose of that debris."). By Order of July 22, 2005, I adopted the reasoning of the Court of Appeals in McNally without prejudice to future submissions as to the extent of my jurisdiction pursuant to the Act. (See Amended Order Following Appellate Remand, Extending Jurisdiction, dated July 22, 2005.)

Having adopted the reasoning of McNally, I turned to furthering the progress of the litigation. The parties appeared before me for a status conference on November 7, 2005 to address the status of limited discovery pursuant to CMO 3 and to address the practicability of adopting a joint offer of proof. At the conference it became readily apparent that any hope for a joint offer of proof had been dashed and I conceded that any further efforts in this regard would be futile. Although abandoning efforts to arrive at a joint offer of proof, I nevertheless acknowledged the dispositive nature of the immunity defenses and directed the parties to proceed, after completion of discovery, by motion. The parties subsequently completed the mandated course of discovery pursuant to CMO 3 in early 2006, with Defendants then proceeding to make motions for judgment

on the pleadings and motions for summary judgment on the basis of state and federal immunity.

## B. The Pending Motions

The motions now pending before me concern whether Plaintiffs may proceed with their claims alleging respiratory injuries sustained at the World Trade Center site[9] during the recovery and cleanup efforts following September 11 against the City and its Contractors (the "City Defendants"),[10] the Port Authority of New York and New Jersey (the "Port Authority"), Consolidated Edison ("Con Ed"),[11] the Silverstein Defendants,[12] and the Westfield Defendants.[13]  The various Defendants assert immunity

---

[9] Pursuant to CMO 3, the World Trade Center site is defined as "the 16-acre site including the sites of the buildings known as 1 World Trade Center, 2 World Trade Center, 3 World Trade Center (a/k/a the Marriott World Trade Center Hotel), 4 World Trade Center, 5 World Trade Center and 7 World Trade Center, as well as the surrounding plaza and underground shopping, parking, and public transit facilities." (See CMO 3 at 1.)

[10] The following contractors join in the City's motions asserting immunity:  AMEC Construction Management, Inc.; AMEC Earth & Environmental, Inc.; Bechtel Associates, P.C.; Bechtel Construction, Inc.; Bechtel Corp.; Bechtel Environmental, Inc.; Bovis Lend Lease, Inc.; Bovis Lend Lease LMB, Inc.; Bovis Lend Lease Interiors, Inc.; Bovis Holdings Ltd.; Bovis Int'l, Inc.; Evergreen Recycling of Corona; Plaza Construction Corp.; Plaza Construction Management Corp.; Tully Construction Co., Inc.; Tully Industries, Inc.; Tully Environmental, Inc.; Tully Consulting Corp.; Tully Construction Company; Turner Construction Company; Turner Construction Co.; Turner Construction Int'l, LLC; Turner/Plaza A Joint Venture.

[11] At the time of oral argument, claims were asserted against the following Consolidated Edison entities: Consolidated Edison Company of New York, Inc., Consolidated Edison, Inc., Consolidated Edison Energy, Inc., Consolidated Edison Solutions, Inc., and Consolidated Edison Development, Inc.  However, by their supplemental submission of July 12, 2006, Plaintiffs submit that they have reached agreement in principal to dismiss without prejudice claims against all Consolidated Edison Defendants with the exception of Consolidated Edison Company of New York, Inc.  For purposes of this motion, I refer to Consolidated Edison Company of New York, Inc. interchangeably either as Consolidated Edison or Con Ed.  A separate order will issue dismissing all cross-claims against incorrectly named Consolidated Edison Defendants.

[12] The Silverstein Defendants, also referred to as the World Trade Center ("WTC") Defendants, include the following entities:  World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, 1 WTC Holdings LLC, 2 WTC Holdings LLC, 4 WTC Holdings LLC, 5 WTC Holdings LLC, Silverstein WTC Properties LLC, Silverstein WTC LLC, Silverstein WTC Mgmt. Co. LLC, Silverstein WTC Facility Manager LLC, Silverstein Properties [sic], and Silverstein Properties LLC.

on the basis of state and federal statutory and common law immunity.  Separately, Con Ed, the Silverstein Defendants, and the Westfield Defendants (collectively the "Lessee Defendants") seek dismissal of all claims against them on the ground that they were divested of their leasehold interests during the duration of the recovery and cleanup efforts at the World Trade Center and thus may not be held liable for injuries sustained during the course of such efforts.  The papers filed on behalf of the City Defendants represent the lead papers in this litigation, with the other Defendants filing motions joining, in whole or in part, the defenses asserted by the City Defendants and providing supplemental arguments in favor of dismissal.

The City Defendants move for judgment on the pleadings and summary judgment.  By their motion for judgment on the pleadings, the City Defendants assert immunity pursuant to the New York State Defense Emergency Act ("SDEA"), the New York Disaster Act ("Disaster Act"), and under state common law.  By their motion for summary judgment, the City Defendants assert immunity pursuant to federal law.

The Port Authority together with the Silverstein Defendants join in part the motions filed by the City Defendants and have filed further, supplemental papers. The Port Authority moves both for dismissal and for summary judgment on the basis of immunity pursuant to the SDEA and moves also for judgment on the pleadings asserting immunity under state common law.  Separately, the Silverstein Defendants move for summary judgment pursuant to the SDEA.  Both the Port Authority and the Silverstein Defendants move for summary judgment on the ground of federal immunity.  The Silverstein Defendants assert further the separate defense that they were divested of their

---

[13] The Westfield Defendants include:  Westfield America, Inc., Westfield WTC Holding LLC, Westfield WTC LLC a/k/a WTC Retail LLC, and Westfield Corp.

leasehold interest at the time that Plaintiffs sustained their alleged injuries and thus may not be liable for damages resulting from such injuries and move for summary judgment on this basis.[14]

The Westfield Defendants move for summary judgment asserting that, as lessees out of possession with no control over the operations at the World Trade Center, that they may not be liable for damages resulting from conditions at the site.  The Westfield Defendants move also on the basis of immunity under the SDEA and, to the extent applicable to non-government actors, pursuant to the Disaster Act, state common law, and federal law.

Con Ed moves for summary judgment on the ground of immunity pursuant to the SDEA and on the basis of federal derivative immunity.  Con Ed joins in the motions of the other Lessee Defendants, namely the Silverstein and Westfield Defendants, seeking dismissal on the ground that as a lessee out of possession it lacked control over the operations at the World Trade Center site.  Separately, Con Ed seeks dismissal of Plaintiffs' claims alleging fraud and misrepresentation, medical monitoring, fear of cancer and wrongful death, and all derivative claims of spouses and children.

The parties appeared before me for oral argument on June 22 and 26, 2006.  By Summary Order of June 23, 2006, in the absence of any showing by Plaintiffs that the claims against them should be allowed to proceed, I granted the Westfield Defendants' motion for summary judgment and dismissed all claims against them currently pending under 21 MC 100.  (See Summary Order, dated June 23, 2006.)

---

[14] Although the Silverstein Defendants join in the pending motions, they assert separately that many of the separate entities named in Plaintiffs' complaint have never had any interest in any part of the World Trade Center and thus were improperly sued.  The Silverstein Defendants reserve the right of these separate defendants to move to dismiss the actions against them on those grounds.

Concerned that Plaintiffs had failed to state viable claims against various of the other Defendants as well, I directed that they re-plead certain of their claims.  By separate Summary Order of June 27, 2006, I dismissed the claims against the Port Authority without prejudice to re-pleading.  I further directed Plaintiffs to re-plead the claims asserted against Verizon and Tishman Construction, as well as various of the contractor defendants.  (Id.)  As to the individual counts set forth in Plaintiffs' Master Complaint, I ordered Plaintiffs to remove those counts alleging claims for medical monitoring and fear of cancer, as these counts are remedies that follow the success of Plaintiffs' substantive claims, and further advised Plaintiffs to reconsider their claim of fraud and misrepresentation.  Plaintiffs also were directed to complete all individual check-off complaints by October 20, 2006.  (Id.)  Finally, I directed Plaintiffs to file supplemental briefing as to the veracity of claims pending against the Silverstein Defendants and Con Ed.  (See Transcript, dated June 22, 2006, 117:4-16; 125:7-9.)  Judgment was reserved as to all other matters.

The parties have now fully complied with all of the foregoing.  Plaintiffs have submitted newly amended Master Complaints as to the separate categories of Defendants with separate complaints filed as to the City, the Port Authority, the World Trade Center Defendants, Con Ed, the Construction Defendants, the Contractor Defendants, Verizon Communications, and the Tishman Defendants.[15]  By their newly amended complaints, Plaintiffs have dropped all claims sounding in medical monitoring and fear of cancer as well as all claims of fraud and misrepresentation.  Thus, Plaintiffs

---

[15] The cases against the Verizon and Tishman Defendants are proceeding separately.  Motions will follow as to these Defendants following the completion of discovery pursuant to CMO 3.

now assert claims for negligence, wrongful death, derivative plaintiffs, and for violations of New York Labor and General Municipal Law.

## IV. THE PREEMPTIVE EFFECT OF THE ATSSSA

The Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 note, sets forth the essential statutory framework for the consideration and treatment of claims arising from the terrorist attacks of September 11, 2001. Enacted following September 11, the Act was aimed at protecting the airline industry from potential economic collapse while simultaneously providing a simplified avenue for recovery by those immediate victims of the attacks who wished to take advantage of that method, and an exclusive federal remedy for all others having a cause of action. See Colaio v. Feinberg, 262 F. Supp. 2d 273 (S.D.N.Y. 2003); see also Hickey, 270 F. Supp. 2d at 362.

By amendments, the protections of the Act were extended to additional parties—of relevance here, the City of New York and the Port Authority of New York and New Jersey. ATSSSA §§ 408(a)(1), (3). The Act, as originally enacted, limited the liabilities of the airline industry defendants to the defendants' insurance coverages. The liability of the Port Authority in relation to its property interest in the World Trade Center was also limited to the aggregate of its liability insurance. ATSSSA § 408(a)(1). Separately, the liability of the City was limited to the higher of its liability insurance coverage or $350,000,000. ATSSSA § 408(a)(3).

As to plaintiffs, those who sustained injury as a direct result of the attacks, were given a special means of redress, in a specially authorized and appropriated Victim Compensation Fund ("VCF") or, alternatively, through litigation in the federal courts,

specifically the United States District Court for the Southern District of New York.
ATSSSA §§ 408(a), 408(b).  Other plaintiffs, including those in the lawsuits which are
the subject of this Opinion, were also granted rights of action arising from the ATSSSA
but, since they incurred their injuries in the days and months following September 11,
could not take advantage of the VCF and were limited to suit in the United States District
Court for the Southern District of New York.

       Plaintiffs argue that granting immunity to the Defendants, pursuant either
to state or federal immunity doctrines, would contradict Congressional intent as
expressed in the Act.  Particularly, Plaintiffs argue, Congress appropriated one billion
dollars to the City, enabling the City to establish a Captive Insurance Fund.  Consolidated
Appropriations Resolution, Pub. L. No. 108-7 (2003).  Plaintiffs argue that Congress
could not have legislated a $350 million ceiling on the City's aggregate liability and a $1
billion special litigation authorization without recognizing the City's exposure to the
claims of those who engaged in the debris removal and cleanup work, for any other
source of significant exposure is not apparent.  This legislative purpose, Plaintiffs argue,
preempts pre-existing state and federal law providing immunity to the City and its
contractors, as well as to the other Defendants.

*A.  The Doctrine of Preemption*

       Determinations as to whether a particular federal law operates to preempt
state law are "fundamentally a matter of Congress' intent."  McNally, 414 F.3d at 371
(citing English v. General Elec. Co., 496 U.S. 72, 78-79 (1990); Hillsborough County v.
Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985)).  The doctrine of preemption,
rooted in the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl.

2, provides that to the extent a state law conflicts with federal law, the contradictory state

law is "without effect."  Hickey, 270 F. Supp. 2d at 366.  The Supreme Court has

recognized two general types of preemption, express and implied.

> Congress can expressly preempt state law by explicitly providing for the
> displacement of state law.  See Hillsborough County v. Automated Med.
> Labs., Inc., 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985).
> Even if Congress does not expressly preempt state law, state law may be
> impliedly preempted if Congress either 1) has legislated in a particular
> field so pervasively that no room is left for concurrent state legislation, see
> id.; or 2) has enacted federal laws that conflict with state laws, see Geier v.
> American Honda Motor Co., 529 U.S. 861, 873-74, 120 S. Ct. 1913, 146
> L. Ed. 2d 914 (2000).

Id.

> There are "no fixed meanings or shorthand rules to demarcate just where

the traditional jurisdiction of state courts and application of state law must be ousted."

Id. at 367.  Courts are to adopt a fluid approach to setting the scope of a particular

statute's preemptive effect.

> Beginning with the presumption that Congress does not intend to displace
> state law, especially in traditional areas of state control, …, courts go on to
> weigh whether the central motivations behind the federal law favor
> preemption—in other words, whether allowing state law to govern would
> undermine federal control or weaken the protections Congress intended to
> provide.

Id.  As a general rule, preemption of areas traditionally subject to state regulation will not

be found unless it is the "clear and manifest purpose of Congress."  CSX Transp. Inc. v.

Easterwood, 507 U.S. 658, 664 (1993) (quoting Rice v. Santa Fe Elevator Corp., 331

U.S. 218 (1947)).

> If, however, traditional state law principles contradict the purpose of a

federal statute, preemption will be applied.  In Burnett v. Grattan, 468 U.S. 42 (1984), the

Supreme Court held that application of a restrictive administrative statute of limitations to

bar litigation under the Civil Rights Act "ignore[d] the dominant characteristic of civil

rights actions: they belong in court."  Id. at 50 (citing McDonald v. West Branch, 466

U.S. 284 (1984)).  Thus, the Court approved application of a more liberal statute of

limitations.  Id. at 55.  The Court of Appeals for the Second Circuit reached a similar

conclusion regarding the application of restrictive state statutes in a section 1983 action

by a former university professor, noting that "[i]t would be anomalous for a federal court

to apply a state policy restricting remedies against public officials to a federal statute that

is designed to augment remedies against those officials, especially a federal statute that

affords remedies for the protection of constitutional rights."  Pauk v. Board of Trustees of

City Univ. of New York, 654 F.2d 856, 862 (1981).

*B.  The Alleged Preemptive Effect of the ATSSSA and the Captive Insurance Fund*

The Act expressly provides that those who sustained injury as a result of

the September 11 attacks may gain redress from the VCF or, alternatively, seek it in

traditional litigation, but only in the federal court for the Southern District of New York.

Both manners of relief are, however, limited in several important respects.  As an initial

matter, eligibility for the VCF is limited to those who suffered physical injury or death as

a result of the terrorist-related aircraft crashes and who were "on the planes or at the

World Trade Center, the Pentagon, or the crash site at Shanksville, Pennsylvania at the

time, or in the immediate aftermath, of September 11, 2001."  Hickey, 270 F. Supp. 2d at

362 (quoting ATSSSA § 405(c)).  Further, upon the submission of a claim under the

VCF, individuals "waive the right to file a civil action … in any Federal or State court for

damages sustained as a result of" the September 11 attacks.  ATSSSA § 405.

To the extent persons who were injured as a result of September 11 chose

not to participate in, or were not eligible for, the VCF, section 408 of the Act, as amended

in November of 2001, establishes a "federal cause of action" as the "exclusive remedy for

damages arising out of" the September 11 attacks.  ATSSSA § 408(b)(1).   The section

further vests the United States District Court for the Southern District of New York "with

original and exclusive jurisdiction" over all claims "resulting from or relating to the

terrorist-related aircraft crashes[.]"  ATSSSA § 408(b)(3).  Creation of a federal cause of

action, however, did not serve to preclude application of state law.  Instead, Congress

expressly provided that, in actions brought pursuant to the Act, the "substantive law for

decision … shall be derived from the law … of the state in which the crash occurred

unless such law is inconsistent with or preempted by federal law."  ATSSSA § 408(b)(2).

Section 408(a) operates also to limit the potential liability of defendants

likely to be named in actions resulting from or relating to the September 11 attacks (other

than the terrorists themselves or those who conspired with, or aided and abetted them).

Thus, the liability of any "air carrier, aircraft manufacturer, airport sponsor, or person

with a property interest in the World Trade Center" may not exceed "the limits of [their]

liability insurance coverage."  ATSSSA § 408(a)(1).  The potential liability of the City of

New York is also limited.  By amendment to the Act, passed at the urging of the City, the

Act expressly provides that "[l]iability for all claims … against the City of New York

shall not exceed the greater of the City's insurance coverage or $350,000,000."  ATSSSA

§ 408(a)(2).  In addition, further to provide financial protection to the City of New York

and its Contractors, another Act of Congress, passed one year later, appropriated 1 billion

dollars in federal funding to "establish a captive insurance company … for claims arising

from debris removal[.]"  Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-

7 (2003).  The Captive Policy insures the City and its Contractors against potential

liability, as well as associated costs and expenses, and affords the City and its Contractors

fully-funded financial protection against all potential claims.  WTC Captive Insurance

Company Liability Insurance Policy, § 2.04 ("Defense of Suits and Related Defense

Costs") (the "Captive Insurance Fund").

*C.  Discussion*

      As noted earlier, I begin "with the presumption that Congress does not

intend to displace state law[.]"  Hickey, 270 F. Supp. 2d at 366 (citing New York State

Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661

(1995)).  Preemption will not be found unless it is the "clear and manifest purpose of

Congress."  CSX Transp. Inc., 507 U.S. at 664 (quoting Rice v. Santa Fe Elevator Corp.,

331 U.S. 218 (1947)).

      Here, neither the plain language of the statute, nor its purpose, evince a

Congressional intent to supplant the application of state law principles.  To the contrary,

Congress expressly provided that the "substantive law for decision" in any suit relating to

the September 11 attacks "shall be derived from the law … of the state in which the crash

occurred," unless "inconsistent with or preempted by federal law."  ATSSSA § 408(b)(2).

Application of such state substantive law is not "inconsistent" with federal law as

embodied in the Act.  See 7WTC, 2006 WL 62019 at *6-8 (granting immunity to the City

of New York pursuant to the New York State Defense Emergency Act as to claims

asserted by Consolidated Edison's insurers for damage resulting from the collapse of

Seven World Trade Center).  Nothing in the Act or its legislative history suggests that

defenses against potential lawsuits are prohibited.  It is Plaintiffs' burden to show that

Congress intended to remove reliance on such defenses insofar as they directly contradict Congressional intent, see Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255 (1984), and Plaintiffs are unable to meet such a burden.

The limited purpose of section 408 was to provide an efficient and rational means for the adjudication of claims relating to or resulting from September 11. It was not intended to guarantee compensation to those injured by the September 11 attacks. The possibility that compensation might ultimately be denied to those who declined to, or were ineligible to, participate in the Fund was contemplated by Congress and expressed by Senator John McCain during the Congressional debate: "To ensure that the victims and families of victims who were physically injured or killed on September 11th are compensated even if courts determine that the airlines and any other potential corporate defendants are not liable for the harm … the [Act] also creates a victims' compensation fund." 147 Cong. Rec. S9589091 at S9594 (Sept. 21, 2001 (statement of Sen. McCain); see also Colaio, 262 F. Supp. 2d 273.

Thus, I decline to extend the scope of federal preemption under the Act to preclude application of otherwise available state law immunity defenses. I further decline to bar application of federal immunity doctrines as contradictory to the alleged compensatory purpose of the Act. The preemptive effect of the Act serves to displace, "not the substantive standards governing liability, but only the state-law damages remedies," McNally, 414 F.3d at 380, in the sense of placing a monetary limit to those remedies. Risks are inherent in the very nature of litigation, even where claims are brought pursuant to express Act of Congress. In re September 11 Litig., Opinion and Order Regulating Testimony at Depositions, 2006 WL 846346, * 10 (S.D.N.Y. March 31,

2006).  Although "[i]t would be anomalous for a federal court to apply a state policy restricting remedies," Pauk, 654 F.2d at 862, to a statute designed to expand remedies, the ATSSSA is not such a statute.  Nor is it the role of the federal courts to eliminate entirely the risks inherent to litigation.  By enactment of the ATSSSA, Congress intended to create a federal forum for the adjudication of claims arising out of the September 11 attacks, to consolidate and rationalize all such suits in a single forum, and to protect defendants against a multiplicity of actions in multiple forums.  To infer from the Act that all Plaintiffs should be entitled to compensation would run counter to the otherwise clearly expressed intent of Congress.  It is an inference that I decline to make.

Having thus ruled, I concede a sense of disquiet.  I have not come across federal legislation of the type we have here—providing a limit to how much aggregate liability the City can incur—except in bankruptcy or insolvency practice, and there is no suggestion of that here.  Nor, except perhaps in the case of atomic energy disasters, have I encountered a contribution from the federal fisc to create a litigation defense fund, and even in that case there is a significant difference.  Here, the City was given one billion dollars to assure against liability, loss or expense, while in the case of atomic energy disaster, there is a provision only of federal insurance.  42 U.S.C. § 2210 (2005).

What, one may ask, was the City, and Congress, contemplating if not the kinds of suits as those over which I preside?  Clearly, provisions of insurance do not concede liability, as Defendants stress, but never have we seen provisions as those we have here.

Provisionally, and subject to further consideration as these cases progress, the case for preemption has not been made.  But neither is there to be a blank check to

enrich lawyers with endless stratagems of motions and delays.  Congress legislated for the public welfare, and that translates in this instance to speedy proceedings towards the merits, to distinguish between cases proving injuries arising from the terrorist-related aircraft crashes and from the conditions resulting from those crashes, and cases lacking proof of such a right to recover, and to fashion remedies appropriate to those showing a right to relief.   These are the goals that I set for the parties, and for myself in presiding over these cases, to bring these cases to a place where they can be settled or tried as speedily as the interest of justice allows.

## V.  THE MOTIONS FOR JUDGMENT ON THE PLEADINGS—STATE IMMUNITY

The various Defendants move for judgment on the pleadings on the basis of various state statutes and doctrines of common law providing for immunity, and assert that liability may not attach for actions taken in response to the terrorist attacks of September 11.  Specifically, the Defendants, in various groupings, assert immunity under the New York State Defense Emergency Act, the New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law, and New York common law.

### A.  The Standard of Review

The standard employed in reviewing a motion for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P., is the same as that employed for motions brought pursuant to Rule 12(b)(6), Fed. R. Civ. P.

A Rule 12(b)(6) motion requires the court to determine if the plaintiff has stated a legally sufficient claim.  A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41,

45-46 (1957); <u>Branum v. Clark</u>, 927 F.2d 698,705 (2d Cir. 1991).  The court's function is

"not to assay the weight of the evidence which might be offered in support" of the

complaint, but "merely to assess the legal feasibility" of the complaint.  <u>Geisler v.

Petrocelli</u>, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether plaintiff may

ultimately prevail, the court must take the facts alleged in the complaint as true and draw

all reasonable inferences in favor of the plaintiff.  <u>See</u> <u>Jackson Nat'l Life Ins. Co. v.

Merrill Lynch & Co.</u>, 32 F.3d 697, 699-700 (2d Cir. 1994).  If matters outside of the

pleadings are considered by the court, the motion shall be treated as motion for summary

judgment, Fed. R. Civ. P. 56, and all parties should be given opportunity to submit

relevant materials.  Fed. R. Civ. P. 12(c).

*B.  The New York State Defense Emergency Act*

        Enacted in 1951, at the height of the Cold War, the New York State

Defense Emergency Act (the "SDEA") provides for a comprehensive response to attacks

upon the United States, and the State of New York, by coordinating the private and

public sectors to "make possible the recovery of the people and the rehabilitation of the

economic and social life of the state following any such attack."  N.Y. Unconsol. Law

SDEA § 9102-a (McKinney 2006).  <u>See also</u> <u>7WTC</u>, 2006 WL 62019 at *6; <u>Daly v. The

Port Authority</u>, 793 N.Y.S.2d 712 (N.Y. Sup. Ct. 2005).  In the interest of ensuring that

public and private entities will work aggressively to prepare for and to respond to attacks,

the SDEA provides immunity for actions taken "in good faith carrying out, complying

with or attempting to comply with" any law or order requiring such a unified response

and relating to "civil defense."  SDEA § 9193.  <u>See also</u> <u>7WTC</u>, 2006 WL 62019 at *6.

        The City Defendants, the Port Authority, the Silverstein Defendants, and

Con Ed, join in asserting immunity pursuant to the SDEA for actions taken in the wake of the September 11 attacks.  Defendants assert that all actions they took in response to the attacks were taken in good faith, to comply with the Declarations of Emergency issued by the President, the Governor, and the Mayor, that all actions related to the "civil defense," and that their actions thus fall within the express grant of immunity provided by the SDEA.

1.  <u>The Immunity Provision of the SDEA</u>

The immunity provision of the SDEA provides for protection to various entities—government, individuals, partnerships, and corporations—who, in good faith, are engaged in activities in preparation for and responsive to attacks on the State, pursuant to the law or to duly promulgated rules, regulations or orders.  The protection extends to preparations against attacks, <u>see</u> <u>7WTC</u>, 2006 WL 62019 at *6 - *8, and to "activities . . . following attacks," including, as part of the definition of "civil defense," essential debris clearance, immediately essential repairs of damaged facilities, and the restoration of essential services.  SDEA § 9103(5).  The SDEA provides that parties engaged in such civil defense activities "shall not be liable for any injury or death to persons or damage to property as the result thereof."

> The state, any political subdivision, municipal or volunteer agency, or another state or a civil defense force thereof or of the federal government or of another country or province or subdivision thereof, performing civil defense services in this state pursuant to an arrangement, agreement or compact for mutual aid and assistance, or any agency, member, agent or representative of any of them, or any individual, partnership, corporation, association, trustee, receiver or any of the agents thereof, in good faith carrying out, complying with or attempting to comply with any law, any rule, regulation or order duly promulgated or issued pursuant to this act, any federal law, or any arrangement, agreement or compact for mutual aid and assistance or any order issued by federal or state military authorities,

> relating to civil defense, including but not limited to activities pursuant thereto, in preparation for anticipated attack, during attack, or following attack or false warning thereof, or in connection  with an authorized drill or test, shall not be liable for any injury or death to persons or damage to property as the result thereof.

SDEA § 9193(1).

2. <u>The Continued Vitality of the SDEA</u>

Plaintiffs argue that the SDEA was enacted during the height of the Cold War as the nation braced for what seemed to be inevitable nuclear attack, and is no longer viable.  Plaintiffs assert further that the SDEA was effectively repealed by subsequent passage of the New York State and Local Natural Disaster and Man-Made Disaster Act, N.Y. Exec. Law §§ 20-29-g (McKinney 2006) (the "Disaster Act").  Plaintiffs' arguments are without merit and run counter to the plain language and express purpose of both the SDEA and the Disaster Act.  The dangers to our nation, state and city that led to the passage of the SDEA are dangers that exist today.  In 1947, we were concerned with the warlike stance of the Soviet Union and international communism.  Today, we are concerned with international terrorism.  Prime Minister Nikita S. Khruschev at the United Nations threatened to bury us, pounding his shoe on the lectern for emphasis.  The terrorists who sent their bombers into the World Trade Center buried almost three thousand of us, and there are too many threats from too many sources to allow us to forget our concerns in sanguine obliviousness.

Enactment of the SDEA was responsive to a perceived threat "of atomic conflict with communist nations and the concomitant need for a comprehensive plan to ensure the survival of the State's citizens in the event of foreign attack." <u>Fitzgibbon v. County of Nassau</u>, 541 N.Y.S.2d 845, 847 (2d Dep't 1989).  As I observed in an earlier

decision, the statute "is not limited to a particular time or a particular threat." 7 WTC, 2006 WL 62019, at *6. I ruled that the legislative history and plain language of the statute show that it was based upon "a broad notion of 'enemy attack' using any kind of weapon capable of inflicting mass injury." Id. Thus, the statute gives broad meaning to the term "attack," defining it as:

> [a]ny attack, actual or imminent, or series of attacks by an enemy or a foreign nation upon the United States causing, or which may cause, substantial damage or injury to civilian property or persons in the United States in any manner by sabotage or by the use of bombs, shellfire, or nuclear, radiological, chemical, bacteriological, or biological means or other weapons or processes.

SDEA § 9103(2). By its plain language the SDEA "is not limited to a nuclear attack or particular enemy." Daly, 793 N.Y.S.2d at 716. Here, it is clear that the hijacking and subsequent crashes of American Airlines Flight 11 and United Airlines Flight 175 into the Twin Towers, resulting in the destruction of a once great financial and business center and in the loss of thousands of lives, constitute an "attack" as contemplated under the SDEA. The SDEA remains viable legislation.

With regard to the Disaster Act, as enacted in 1951, its application was limited to natural disasters such as "flood, drought, tidal wave, fire, hurricane, earthquake, windstorm, or other storm, landslide, or other catastrophe," and not disasters resulting from "an enemy attack as defined in the New York state defense emergency act." N.Y. Executive Laws Art. 2 § 10 (repealed). Almost thirty years later, in 1978, the definitions were expanded to include disasters resulting from "man-made causes." N.Y. Cons. Laws, Executive Laws Art. 2(b) § 20(2)(a). But nothing in the plain language of the statute or in its legislative history suggests an intent to override the immunities provided by the SDEA. The two statutes must be read together, harmoniously. See

J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 143-44 (2001)

("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a

clearly expressed congressional intention to the contrary, to regard each as effective.")

(quoting Morton v. Mancari, 417 U.S. 535, 551 (1974)) (internal quotation marks

omitted).)  See also Rodriguez v. United States, 480 U.S. 522, 524 (1987) ("[R]epeals by

implication are not favored, and will not be found unless an intent to repeal is 'clear and

manifest.'") (quoting United States v. Borden, 308 U.S. 188, 198 (1939)) (internal

quotation marks and citations omitted).  Thus, I hold that the SDEA remains a valid basis

for asserting immunity. See 7 WTC, 2006 WL 62019, at *6; Daly, 793 N.Y.S.2d at 716.

    3.  Qualifying Laws under the SDEA

        The grant of immunity provided by the SDEA is limited to actions taken

"in good faith carrying out, complying with, or attempting to comply with" "any law, any

rule, regulation or order duly promulgated or issued pursuant to [the SDEA]" and

"relating to civil defense[.]" SDEA § 9193(1).  All agree that neither the Mayor nor the

Governor of New York invoked any provisions of the SDEA in their various declarations

of emergency following September 11.  But that does not mean that the governmental

entities, and the persons, firms and corporations that were engaged in debris removal and

cleanup of the World Trade Center site did not act pursuant to the laws, regulations and

orders issued by the President, Governor and Mayor to organize the carrying out of such

activities.

        The SDEA defines "law" broadly to include "[a] general or special statute,

law, city, or village charter, local law, ordinance, resolution, rule, regulation, order or rule

of common law."  SDEA § 9103(17).  The Executive Orders issued by the Mayor of the

City of New York and the Governor of the State of New York are precisely such laws.
By their executive orders, the Mayor and the Governor ordered the City and State civil
defense agencies to engage in civil defense activities.  "Civil Defense Activities" are
defined by the statute to include immediately essential repairs and restoration of essential
services.  The City and State agencies acted also pursuant to the common law, for when
an emergent disaster threatens society as a whole, the doctrine of *salus populi supreme
lex* (the welfare of the people is the highest law) requires the government to act, enlisting
persons, firms and corporations in the private sector to eliminate the threat to society and
restore society's ability to function.  See Matter of Cheesebrough, 78 N.Y. 232 (1879).
*Salus populi* means "that society has a right that corresponds to the right of self-
preservation in the individual, and it rests upon necessity because there can be no
effective government without it."  Daly, 793 N.Y.S.2d at 721-22 (quoting 20 N.Y. Jur.
2d. Const. Law § 192).  *Salus Populi* and the SDEA coincide, for both encourage
immediate action to preserve society.  See id. at 718.

       Plaintiffs argue that the Contractor Defendants, since they were engaged
by private contracts and since they acted, not pursuant to the Mayor's and Governor's
Executive Orders, but pursuant to their contracts, were not "carrying out, complying with
or attempting to comply with any law, any rule, regulation or order duly promulgated or
issued pursuant to [the SDEA]." SDEA § 9193(1).  Plaintiffs cite Abbott v. Page
Airways, 245 N.E.2d 388 (N.Y. 1969), where the New York Court of Appeals declined to
extend SDEA immunity to a helicopter company that was engaged by the Director of the
Civil Defense Office of Monroe County, New York, pursuant to contract, to hover over a
riotous demonstration in the City of Rochester to enable the Director to survey the

disorder.  The chartered helicopter crashed, killing four people, injuring several others, and causing extensive property damage.  Id.  The helicopter company claimed immunity pursuant to the SDEA.  The New York Court of Appeals held, however, that the helicopter company was not entitled to immunity from suit pursuant to the SDEA, as the defendant was "doing nothing more … than engaging in its regular course of business of providing air transportation for hire."  Id. at 391.  "[T]he policy of New York State," the Court of Appeals held, "has been to reduce rather than increase the obstacles to recovery of damages for negligently caused injury or death."  Id.

Plaintiffs contend that the Contractor Defendants were paid for their services, and thus were "doing nothing more … than engaging in [the] regular course" of their respective businesses.  Id.  However, one cannot compare the havoc caused by the September 11 attacks, and the concomitant need for private assistance with the riot in Rochester in the mid-1960s.  The declarations of emergency following the September 11 attacks authorized the City's remedial actions and its call for the assistance and cooperation of scores of private entities and thousands of workers.  In contrast, the helicopter company in Abbott was involved in the emergency response in the most limited and peripheral sense.  To deny immunity here based on the mere fact of payment for services rendered, without considering the circumstances presented by the September 11 attacks, would run counter to the plain language of the SDEA, expressly contemplating participation by private actors and providing an intentionally expansive definition of legal authorities.  Plaintiffs' argument is more properly addressed to the question whether Defendants were undertaking civil defense activities in good faith, and it is to this argument that I now turn.

4. <u>Civil Defense Activities and the Requirement of Good Faith</u>

      *a.   Civil Defense Activities*

      The grant of immunity under the SDEA is limited to "civil defense" "activities and measures designed or undertaken … to minimize the effects upon the civil population caused or which would be caused by an attack."  SDEA § 9193.  Where the activities are taken in response to an attack, civil defense measures are defined to include, among a wide range of measures, "essential debris clearance," "immediately essential emergency repair or restoration of damaged vital facilities," "means and methods for the recovery and rehabilitation of the state," and "the restoration of essential community services, industrial and manufacturing capacity, and commercial and financial activities in the state."[16]  Specifically, civil defense activities responsive to an attack include:

> activities for fire fighting; rescue, emergency medical, health and sanitation services; monitoring for radiation and other specific hazards of special weapons; decontamination procedures; unexploded bomb reconnaissance; essential debris clearance; emergency welfare measures; immediately essential emergency repair or restoration of damaged vital facilities; the implementation of the means and methods for the recovery and rehabilitation of the state; effective utilization of all persons and materials; care and shelter for those made homeless; distribution of stockpiled food, water, medical supplies, machinery and other equipment; the preservation of raw materials; the restoration of essential community services, industrial and manufacturing capacity, and commercial and financial activities in the state; and the resumption of educational programs[].

SDEA § 9103(5).

---

[16] Civil defense is also defined to include activities in preparation for an attack.  Such measures include: "the establishment of appropriate organizations, operational plans, and the supporting agreements; the recruitment and training of personnel; the conduct of research; the procurement and stockpiling of materials necessary to the survival, recovery and rehabilitation of the state and of its inhabitants; the provision of suitable warning systems; the construction or preparation of shelters and control centers; provisions for the continuity of state and local governments; and, when appropriate, the non military evacuation of the civil population[.]"  SDEA § 9013(5).  <u>See also</u> <u>7 WTC</u>, 2006 WL 62019, at *6 (granting immunity to the City of New York for claims arising from the construction and management of the City's Office of Emergency Management).

"[T]he framers [of the SDEA] undoubtedly anticipated that the various civil defense functions contemplated by the Act would be undertaken *during the rush of emergency*." Fitzgibbon, 541 N.Y.S.2d at 849 (emphasis added). Thus, in Fitzgibbon, the court excluded routine patrol functions from the immunity provisions of the Act. The court held that although directing traffic in the event of an attack would be covered by SDEA immunity, the SDEA would not grant immunity to the actions of an auxiliary police officer engaged in otherwise routine patrol functions. Id. at 849-50. The court reasoned that if a defendant was engaged in conduct otherwise ordinary and routine to its business, the mere presence of an emergency condition would not operate to mandate the extension of SDEA immunity to otherwise routine conduct. See Abbott, 245 N.E.2d 388; see also 7 WTC, 2006 WL 62019, at *6 (distinguishing between "routine conduct for which there is no immunity under the [S]DEA, and conduct that a municipality performed while engaged in a civil defense function"). Thus, the statute defines as a civil defense activity, not all debris clearance, but only "essential" debris clearance; not all repair or restoration of damaged vital facilities, but only that which is "immediately essential" and which constitutes "emergency" repair or restoration; and not the restoration of all community services, but only those which are "essential."

  b.  *The Requirement of Good Faith*

Civil defense actions pursuant to the SDEA must also be taken in "good faith carrying out, complying with or attempting to comply with" the legal authorities enumerated therein in order for immunity to attach. SDEA § 9193(1). In this respect, Defendants again urge that the relevant inquiry is not *how* the Defendants acted, but rather *why* the Defendants acted. According to Defendants, the good faith requirement

refers only to Defendants' compliance, or attempted compliance, with a civil defense law within the meaning of the SDEA.  Moreover, Defendants assert that, regardless of the proper form of inquiry, Plaintiffs have in any event failed to make a showing of bad faith sufficient to defeat the pending motion for judgment on the pleadings.

To date, no cases, either federal or state, have directly addressed the nature of the SDEA's good faith requirement.  The courts have, however, interpreted the parallel good faith provision of the SDEA's precursor statute, the War Emergency Act ("WEA"), in a series of cases addressing claims arising from injuries sustained during the mandatory blackouts of the 1940s.  Defining good faith as "an honesty of intention," Smith v. Town of Orangetown, 57 F. Supp. 52, 55-57 (S.D.N.Y. 1944), the courts have focused their inquiry on whether the individual defendant's alleged negligence resulted from a good faith attempt to comply with an order or regulation cognizable under the WEA.

Thus, in Smith, the District Court affirmed the jury's grant of immunity to a police officer who, while driving during a blackout, drove into a group of soldiers, killing one and wounding several.  Id. at 53.  The analysis adopted by the trial court required a two part inquiry: first, whether the defendant had acted negligently, and, if so, whether the defendant had been pursuing his duties in good faith at the time of the alleged negligence.  Id. at 54.  So long as the defendant was acting in a good faith attempt to comply with his duties, liability for negligence would not attach.  Id.  Similarly, in Gaglio v. the City of New York, 143 F.2d 904 (2d Cir. 1944), the Second Circuit affirmed the District Court's setting aside of a jury verdict in favor of a plaintiff who sustained injuries after falling onto a railroad track allegedly as a result of dim lighting

necessitated by the mandated blackouts.  Id.  The Gaglio court noted that the proper

inquiry was not how the City acted but, rather, whether the City's actions constituted a "it

bona fide attempt to comply with … army regulations."  Id.

      The grant of immunity under the WEA, however, was not absolute.  In

Jones v. Gray, 45 N.Y.S.2d 519 (App. Div. 1943), a case factually similar to Smith, an air

raid warden, while allegedly responding to a blackout, crashed his car into another

vehicle, killing several people.  Id. at 520.  The defendant argued that he was immune

from liability pursuant to the WEA.  The court rejected this defense finding that the

warden was not "in good faith … attempting to perform his duties as an air warden at the

time of the collision," but instead was on what could only be characterized as a fateful

"joy ride."  Id. at 523.

      Good faith thus may not be inferred simply from the fact that, at the time

of the allegedly negligent acts, the Defendants were acting in a manner responsive to a

declaration of emergency.  Nor may cases granting immunity for isolated incidents of

negligence be extended as to allow for the wholesale grant of immunity to incidents of

negligence that occurred, not at isolated intervals, but rather continually over a period of

several months.  Although the question of why the Defendants acted may ultimately

prove critical to determining immunity under the SDEA, the interests of justice mandate

also a consideration of *how* the Defendants acted.  Special consideration must also be

given where the obligation of good faith runs, not to third parties potentially injured by

the attacks, but instead to those directly engaged, for all intents and purposes as

employees, in the recovery effort.  Those who engage others in their service owe definite

and specific obligations which may not easily be abandoned.

### c. Discussion

Defendants argue that as long as they were attempting to comply with a legal authority "relating to civil defense" and doing so "in good faith," they should be entitled to SDEA immunity, and should not be accountable for any deficiencies or negligence in how they carried out their activities, even to the workmen to whom they would otherwise owe a duty.  Under this interpretation of the SDEA, immunity should extend to all of Defendants' activities that were responsive to the civil defense emergency created by the attacks, from beginning to end, as they concerned the implementation of "means and methods for the recovery and rehabilitation" of the City.  SDEA § 9103(5).  Thus, there should not be an inquiry into whether or when an emergency condition existed or ceased to exist, or whether the specific actions undertaken were themselves in good faith.  The plain language of the statute, however, considered together with the unique and important public policies implicated by the instant litigation, counsel against adoption of Defendants' arguments.  The proper analysis requires consideration of potential temporal limitations on the grant of immunity as well as a consideration of the obligation of good faith that extends beyond mere implementation.

Critically, the statute extends immunity, not to all activities following an emergency, but limits immunity only to those activities that are, in themselves, "essential," or "immediately essential," and "emergency" in nature.  The few cases are in accord, limiting the statute and generally finding liability.  See e.g., Abbott, 245 N.E.2d 388.  Thus, the statute's text limits immunity to activities that must be done immediately to resolve pressing needs, in order to enable society to prepare for an attack, and to begin to function following an attack.

The limitation of immunity to acts undertaken in the context of an emergency is essential to ensure "the least possible interference with the existing division of the powers of the government and the least possible infringement of the liberties of the people[.]"  SDEA § 9102.  Limitations on the right to seek redress for injuries sustained must be strictly limited, extended only where necessary to restore the ability of society again to begin functioning.  Defendants argue that immunity is necessary to encourage companies to volunteer their efforts; the fear of lawsuits, Defendants argue, otherwise will cause them to hold back.  But individual workers also are essential to the response effort, and those who claim injury are the very individuals who, without thought of self, rushed to the aid of the City and their fallen comrades.  Their efforts also must be encouraged, for their fear of injury without redress can cause such volunteers also to hold back.  A delicate balance has to be struck, one that encourages both companies and individuals to come forward to clear the effects of the blows to society.

These two competing interests, namely the need to allow for an immediate and effective response to an attack on the state as against the need to ensure persons injured the right of redress, may be considered as existing along a spectrum.  Where the emergency condition predominates, the interest of protecting those engaged to assist in the emergency response must necessarily be of less concern.  In the rush of an emergency, the ability and capacity to adequately implement and effect necessary safety procedures is greatly reduced.  The SDEA's immunity provision operates to ensure that fear of liability will not operate to dissuade government and private entities from responding to a disaster, even in the absence of otherwise mandated safety protocols and procedures.  However, as the emergency condition fades, as the rights and obligations of

persons and entities engaged in the response effort become regulated by contract,[17] as procedures and protocols are implemented to protect against potential dangers, the need for immunity diminishes and the obligations and duties otherwise imposed once again must be protected.

There is no bright-line demarcation between that which is emergent and that which is done in the more normal course.  In a jurisdictional setting, I proposed to create a two-week period after September 11, to September 29, 2001, at which time, pursuant to order of the Mayor, efforts turned from rescue of victims to clearance of debris.  See Hickey, 270 F. Supp. 2d at 374 (holding that causes of action of workers claiming respiratory injury arose under the Air Transportation Safety and System Stabilization Act before September 29, 2001, and under New York State law thereafter).  The Court of Appeals, however, disapproved of any such bright-line and ruled that claims throughout the period of the rescue and recovery effort were covered by the Act.  See McNally, 414 F.3d at 380-81.  The New York Supreme Court applied the bright-line rule of Hickey to claims under the SDEA, but the questionable efficacy of Hickey casts doubt also on the decision of the New York Supreme Court.  Daly, 793 N.Y.S.2d at 719.

That an emergency existed for some time following September 11 is without question.[18]  But whether the emergency lasted for days, or weeks, or months, and in connection with which precise activities, are fact-intensive questions, not possible to

---

[17] Draft contracts between the City and the Primary Contractors show that continued compliance with applicable safety regulations was required.  (Pls.' J.A. Vol. 6, Ex. 110.)

[18] Defendants point to the fact that the State of Emergency within the City of New York was renewed by Mayoral Order every five days, from September 11, 2001 through June 29, 2002, as proof that the emergency condition existed throughout the duration of the rescue and recovery effort.  The renewed Proclamations of Emergency, however, served as a general authority for City agencies to take "whatever steps necessary" to respond to the September 11 attacks.  The Proclamations do not serve to define "emergency" for purposes of determining the extent and scope of immunity under the SDEA.

answer in connection with a Rule 12 motion addressed to the pleadings.  Clearly, the desperate search for survivors constituted an unprecedented setting, and nothing about what took place in connection with such a search could be considered ordinary or routine—at least, so it would seem.  But at some point after the attacks, the emergency conditions subsided, the extraordinary settled into a routine, and the Defendants' argument for immunity loses cogency under the teachings of the New York cases.

The difficulty of discerning the precise point at which the emergency condition ceased to exist is further complicated by the SDEA's parallel requirement of good faith.  The SDEA mandates that all actions pursuant to the Act be undertaken "in good faith carrying out, complying with or attempting to comply with" relevant legal authorities.  SDEA § 9193(1).  The factual record before me shows clearly that, in responding to the September 11 attacks, Defendants endeavored to develop a viable health and safety plan for workers at the site.  As Defendants put it, the efforts to ensure worker health and safety were extensive and included:

> (1) employing health and safety experts; (2) participating in daily health and safety meetings; (3) implementing health and safety protocols, plans, and agreements; (4) adopting a clear and consistent respiratory protection policy, devised by experts and based on proven monitoring and analytical techniques; (5) sharing environmental information with intergovernmental agencies; (6) consulting with top experts in the selection of respirators; (7) overcoming Herculean challenges in acquiring and distributing respirators to workers from the outset; and (8) consistently making an effort to ensure worker compliance with respirator use directives.

(Defs.' Reply Mem. at 30).  The pleadings, however, show also that there were critical lapses in the enforcement of safety standards and in the dissemination of vital information about the safety of the air at Ground Zero to those most affected, the workers themselves.  (See Pls.' Timeline at 8, 11, 13, 14, 19, 20, 27, 28, 29, 30, 31, 33, 34, 35, 36,

37.)  As of January 2002, compliance rates for respirator usage fell below twenty-nine

percent, and Plaintiffs allege that "[r]espirator fit testing done at and around the WTC site

was illusory, at best," and, in any event, "did not meet OSHA standards."  (Pls.' Master

Compl. at ¶ 383.)

             Accepting all allegations alleged in the complaint as true, as I am required

to do on a motion pursuant to Rule 12(c), Fed. R. Civ. P., I cannot determine at this stage

that Defendants' actions all were in good faith, nor which acts might have been, and

which appear not to have been, conducted in good faith.  There is no standard in case law

to help me determine if good faith should be considered according to the motives with

which actions were undertaken, in which case good faith likely would be found, or if

good faith should be considered in the context of the particular acts as to which the

Defendants allegedly were negligent, in which case standards of good faith would tend to

merge into standards of negligence.  Regardless of Defendants' efforts and motives to

develop safety standards, if the standards were not implemented or enforced in a

systematic and reasonable manner, liability well may attach.  It may not be sufficient for

Defendants to assert simply that they were acting in a good faith attempt to comply with

the various declarations of emergency, without considering also what they did, and did

not, do.  The cases over which I preside involve, not third parties claiming injury because

of conduct of an emergency provider, but by the emergency providers themselves, based

on allegations that those in charge of their respective workplaces did not provide the

training and equipment available and necessary and appropriate to allow them to do their

work and to protect them against the dangers incident to their workplaces.   Whether

Plaintiffs will be able to make a showing of bad faith is a question of fact for the jury that

may not be summarily determined at this stage in the litigation.  See Smith, 57 F. Supp. at

55 ("[T]he existence of good faith is an issue for the jury to decide in any case[.]").[19]

All of this teaches that one has to be cautious in considering a Rule 12(c)

motion for judgment on the pleadings on the basis of a fact-laden defense.  Defendants'

motion accepts Plaintiffs' allegations of respiratory injury as fully proved, and so they

must be in the context of a Rule 12(c) motion for judgment on the pleadings.  Fed. R.

Civ. P. 12(c).  A valid affirmative defense defeats even a well-pleaded claim, and the

SDEA certainly is a valid defense, but the scope and extent of applicability of the defense

is unclear, and a judge must be hesitant to apply such a defense beyond its narrow

parameters to a valid claim of injury.

*C.  The Argument of Immunity Under the New York Disaster Act*

The New York State and Local Natural Disaster and Man-Made Disaster

Preparedness Law (the "Disaster Act"), N.Y. Exec. Law §§ 20-19-g (McKinney 2006),

provides another basis for the City Defendants' arguments of immunity.

---

[19] Outside of the applicability of the SDEA's general immunity provision, the Plaintiffs assert further that section 9193(2) of the SDEA bars application of immunity in this instance.  Section 9193(2) provides that the immunity provisions of the SDEA may not operate to:

> affect the right of any person to receive benefits to which he may be entitled under the workers' compensation law, volunteer firefighters' benefit law, volunteer ambulance workers' benefit law, any pension law or the general municipal law, nor the right of any person to receive any benefits or compensation under any act of congress or under any law of this state.

SDEA § 9193(2).  Plaintiffs assert that enactment of the ATSSSA establishes a system of benefits and compensation analogous to a state workers' compensation system and thus precludes application of immunity insofar as it might operate to bar the rights of the Plaintiffs to receive such benefits.

For the reasons stated in my earlier discussion of the preemptive effect of the ATSSSA, Plaintiffs argument is without merit.  The ATSSSA was intended to create a federal forum for the adjudication of claims arising out of September 11 and to provide certain defendants with the protections necessary to avoid financial ruin.  Its enactment did not serve to establish any form of guaranteed compensation to anyone other than those eligible to obtain relief through the Victim Compensation Fund.  In the absence of such a guaranteed scheme for compensation, section 9193(2) is inapplicable.

1.  <u>The Limited Scope of the Disaster Act's Application</u>

The Disaster Act provides that, upon the "occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property, resulting from any man-made or natural causes," Disaster Act § 20(2)(a), the "chief executive of any political subdivision is … authorized and empowered to and shall use any and all facilities, equipment, supplies, personnel and other resources of his political subdivision in such manner as may be necessary or appropriate to cope with the disaster or any emergency resulting therefrom."  Disaster Act § 25(1).  The Disaster Act provides also for immunity for discretionary functions performed by a political subdivision's officers and employees:  "A political subdivision shall not be liable for any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of any officer or employee in carrying out" its provisions.  Disaster Act § 25(5).  Political subdivisions are given immunity for those of its acts responding to a disaster that:  (1) constitute discretionary functions or duties; and (2) are performed by its officers or employees.

Thus the Disaster Act protects political subdivisions, and immunizes then against lawsuits based on discretionary acts of their political officers and employees.  There also are additional limitations relating to the Governor's powers to suspend laws, but not to suspend those laws that safeguard the public health and welfare.  Section 29-a of the Disaster Act grants the Governor of the State of New York the authority to "suspend specific provisions of any statute, local law, ordinance, or orders, rules or regulations … during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster."  Disaster Act

§ 29-a(1).  By implication, the obligations of the government to act consistently with statutory or regulatory duties remain in effect unless the Governor orders the suspension of such laws.  Furthermore, the Governor may not suspend a law which safeguards public health and welfare and which is not "reasonably necessary" to the responsive effort.

> No suspension [of law] shall be made which does not safeguard the health and welfare of the public and which is not reasonably necessary to the disaster effort.

Disaster Act § 29-a(2)(b).

The rationale of the Disaster Act is clear.  Political subdivisions of the State are to act to preserve the health and welfare of the public, but not at the expense of the public's health and welfare.  The firemen, policemen and construction workers worked at the site to further the health and welfare of the public, but the political subdivisions that regulated their work were not at liberty to sacrifice their health and welfare, except possibly if there was no other way to combat the emergency effects of the disaster.  And, significantly, Governor Pataki did not exercise his authority under section 29-a of the Disaster Act to suspend the protections of the New York Labor Law governing the health and welfare of workers at construction sites, presumably because "compliance with such provisions [did not] prevent, hinder, or delay action necessary to cope with the disaster."  Disaster Act § 29-a(1).  It follows that the provisions of the New York Labor Law relevant to worker safety remained in effect throughout the duration of the rescue and recovery effort, and that it was incumbent on those responsible for supervising the site to comply with those laws.

Thus, the City Defendants cannot argue cogently that they should be immunized for their decisions and conduct in putting out the fires and removing the

debris from the rubble of Towers One, Two and Seven no matter what they did.  As I ruled in relation to the SDEA, specific actions have to be evaluated according to time, place and necessity.  There is likely to be a setting where immunity should be upheld, but the decisions cannot be made on motion, without a complete record. There is nothing in the Disaster Act that extends immunity beyond that provided by the SDEA, except perhaps if the Governor had found the need to suspend the New York Labor Law and other regulatory protections of the workplace.

The City Defendants argue that a liberal extension of immunity is important to encourage public actors to respond fully to a public disaster, for "[a] public officer, haunted by the specter of a lawsuit, may well be subject to the twin tendencies of procrastination and compromise to the detriment of the proper performance of his duties."  Rottkamp v. Young, 249 N.Y.S.2d 330, PIN (App. Div. 1964).  But large numbers of working people, as well as City officials, must work together to restore a society struggling to recover from a disaster.  Extending too large an immunity to official actions, at the expense of the health and welfare of working people, will discourage one group of people while encouraging another group of people.  "Neither the City nor any other entity has discretion to violate an applicable statute," Daly, 793 N.Y.S.2d at 721, least of all the strong policy of New York protective of worker safety.  Hickey, 270 F. Supp. 2d 357.   The Disaster Act should not be read to create blanket immunity.

Like the SDEA, the Disaster Act's grant of immunity is limited to actions that are emergent in their own quality, and not only because those actions were intended to alleviate a previous emergency condition.  The Disaster Act authorizes actions upon the "occurrence or imminent threat of" a disaster, Disaster Act § 20(2)(a), and which are

"necessary or appropriate to cope with the disaster or any emergency resulting therefrom."  Disaster Act § 25(1).  Immunity is thus provided, not necessarily to any actions taken in consequence of a disaster, but instead only to those actions which are necessary to cope with the disaster.  Immunity is to be conferred sparingly, and is not to be a cloak excusing all accountability.  Abbott, 245 N.E.2d 388.  The issue is fact intensive, and fixing the precise point when emergency efforts became routine is difficult.  A proper resolution of the issue requires a properly developed factual record.  See McNally, 424 F.3d 352.

   For all these reasons, I decline to grant immunity under the Disaster Act beyond that which is available under the SDEA.

### 2.  The Extension of Disaster Act Immunity to Non-Government Actors

   The Disaster Act expressly limits its grant of immunity to actions taken by political subdivisions and their employees and officers.  The City Defendants argue, however, that the grant of immunity should be extended to the private contractors whom the City engaged, and that doing so would be consistent with the policy of the Disaster Act and basic principles of common law.  The argument, insofar as it argues for an immunity wider than that available under the SDEA, is without merit.

   The immunity provision of the Disaster Act, section 25(5), offers protection only to "political subdivision[s]," and only when their officers or employees "exercise or perform" discretionary functions or duties."  See also Disaster Act § 29-b(2), (3) (granting immunity to local civil defense forces operating under the direction and command of the city civil defense director as authorized by the governor).  Had the

legislature intended for immunity to extend to private actors, it could easily have so provided.  I decline to legislate that which the legislature did not provide.

### D.  New York State Common Law Immunity

The City Defendants, together with the Port Authority and Con Edison, seek immunity also on the basis of state common law, arguing that they performed uniquely governmental functions in the aftermath of the September 11 attacks.  In general, although the common law does provide immunity for acts that are "completely sovereign in nature and completely foreign to any activity which could be carried out by a private person,"[20] Williams v. State, 456 N.Y.S.2d 491, 493 (App. Div. 1982), there are important limitations.  Common law immunity is limited to governmental acts that are discretionary in nature. Furthermore, the common law does not extend immunity to private entities that are sued for negligent or willful behavior.  See Haddock v. City of New York, 553 N.E.2d 987, 991 (1990); see also Royal Ins. Co. v. Ru-Val Elec. Corp., 918 F. Supp. 647, 659 (E.D.N.Y. 1996).  Important public policy considerations require that the immunity granted to private entities acting at the behest of government entities be limited.  Royal Ins. Co., 918 F. Supp. at 659-60.

The City and Port Authority argue that all acts performed in response to the September 11 attacks were discretionary and unique to governmental entities, including the exercise of traditional police powers in the interest of public health and safety.  My task, however, is not to evaluate claims in their generality, but to "scrutinize specific claims," for "[i]t is the specific act or omission out of which the injury is claimed

---

[20] The immunity is a common law exception to the waiver of sovereign immunity pursuant to passage, in 1929, of the New York Court of Claims Act, N.Y.S. Ct. Cl. Act § 8.  See Royal Ins. Co. v. Ru-Val Elec. Corp, 918 F. Supp. 647, 659-60 (citing Florence v. Goldberg, 375 N.E.2d 763, 766 (1978)).

to have arisen and the capacity in which that act or failure to act occurred" that determines governmental immunity.  In re September 11 Litigation, 280 F. Supp. 2d at 303 (quoting Weiner v. Metro. Transp. Auth., 433 N.E.2d 124, 127 (1982).  The issue cannot be decided in the context of a motion for judgment on the pleadings.  It requires a proper, and fully developed, factual record. [21]

## VI. THE MOTIONS FOR SUMMARY JUDGMENT—FEDERAL IMMUNITY

Defendants argue that they are entitled to immunity also under federal law, pursuant to the Stafford Act and under principles of federal derivative immunity.  The Defendants assert that their actions after September 11 mainly were at the express direction of federal government agencies and that immunity should therefore extend to them insofar as they acted at the behest of the federal government.  The Defendants assert further that to impose liability would run counter to basic principles of law to the extent that the federal government is the real party in interest.  Defendants move for summary judgment, after full discovery relevant to their defense of federal immunity.

### A.  Standard of Review

Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine issue" of "material fact" exists "if

---

[21] To the extent that immunity is in fact found to apply to government actions taken in the aftermath of the September 11 attacks, the Contractor Defendants and Con Edison assert that they are entitled to derivative governmental immunity.  The Contractor Defendants and Con Edison assert that the extension of immunity is proper to the extent that they:  (1) were at all times working under the direction of the City; and (2) that the actions of which Plaintiffs complain were undertaken pursuant to City directives.  See Yearsley v. W.A. Ross Construction, 309 U.S. 19 (1940).  Because the grant of immunity pursuant to common law would at this stage be premature in light of the potential grant of statutory immunity, I decline to reach this argument here.

the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although all facts

and inferences therefrom are to be construed in favor of the party opposing the motion,

see Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir. 2001), the non-

moving party must raise more than just "metaphysical doubt as to the material facts,"

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "[M]ere

speculation and conjecture is insufficient to preclude the granting of the motion." Harlen,

273 F.3d at 499.  "If the evidence is merely colorable or is not significantly probative,

summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

### B.  Derivative Federal Immunity

The practicalities of modern governance have led courts, over the past

sixty years, to extend the immunity traditionally afforded to the federal government for

actions taken in furtherance of its government functions to private entities hired to

facilitate the government in the implementation of its programs and goals. See Yearsley

v. W.A. Ross Const. Co., 309 U.S. 18 (1940).  The extension of such immunity stems

from the premise that, "[t]o insulate the United States from its discretionary decisions,

but not to do likewise when the United States enters into contracts with others to execute

the will of the United States 'makes little sense.'" Richland-Lexington Airport District v.

Atlas Properties, Inc., 854 F. Supp. 400 (D.S.C. 1994) (quoting Boyle v. United Techs.

Corp., 487 U.S. 500, 511-512 (1988)).  Indeed, the primary purpose of the defense "is to

prevent the contractor from being held liable when the government is actually at fault"

but is otherwise immune from liability. Trevino v. General Dynamics Corp., 865 F.2d

1474, 1478 (5th Cir. 1989).

Defendants, the City of New York and its Contractors as well as the Port Authority and the WTC Defendants, urge that under the principles first enunciated in Yearsley, 309 U.S. 18, and further developed in Boyle, 487 U.S. at 505, and Richland-Lexington, 854 F. Supp. 400, they are entitled to immunity for actions taken in the aftermath of the September 11 attacks to the limited extent that such actions were controlled by and undertaken pursuant to the direction of federal agencies, namely the Army Corps, OSHA and the EPA. They contend that to impose liability on Defendants for actions that were undertaken at the direction of federal agencies would work a manifest injustice and would severely hinder the ability of the government to provide an effective and immediate response to future disasters.

1.  The Relevant Case Law

The Supreme Court first recognized the doctrine of derivative immunity for private contractors, the so-called government contractor defense, in Yearsley, 309 U.S. 18, dismissing a suit by landowners for damage to their property arising from work performed by a private contractor pursuant to a contract with the federal government. The landowners alleged that the contractor's negligence in constructing dikes in the Missouri River at the direction of the federal government led to the erosion of ninety-five acres of private property. Id. The Court held that the interests of justice required that federal immunity be extended to private contractors where: (1) the contractor was working pursuant to the authorization and direction of the federal government; and (2) the acts complained of fell within the scope of such government directives. Id. at 21. Under the rule set forth in Yearsley, so long as, "[the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of

Congress, there is no liability on the part of the contractor for executing" the will of the federal government.  Id.  Thus, liability may attach only where the contractor exceeded the scope of his authorization, or where the authority itself was not validly conferred.  Id.

The purpose and scope of the government contractor defense was clarified and expanded in Boyle.  487 U.S. 500.  There, pursuant to specifications provided by the United States, a private manufacturer had constructed a military helicopter with an allegedly defective escape hatch.  Id. at 502-503.  As a result of the defective hatch, the co-pilot was killed when he was unable to open the hatch after the helicopter crashed into the water.  Id.  A jury had returned a verdict in favor of the executor of the co-pilot's estate on the basis of state law.  Although remanding for further consideration, the Supreme Court held that principles of government immunity applied with equal force to the case of a private manufacturer acting pursuant to precise government specifications.  Id.  Rejecting the argument that federal immunity is necessarily limited to actions taken by an official in the course of performing his or her duties as a federal employee, the Court instead framed the essential issue as the "uniquely federal interest" "in getting the Government's work done."  Id. at 505.  Such unique federal interest, in turn, mandated the displacement of state law to the extent that application of state law principles would give rise to a "significant conflict" with an "identifiable 'federal policy or interest.'"  Id. at 507 (quoting Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 69 (1966)).

The Court made clear, however, that a federal interest alone is insufficient to displace state law.  Id. at 507.  State law is instead displaced only where it presents a significant conflict with federal policy, such that "the application of state law would 'frustrate specific objectives' of 'federal legislation.'"  Id. (quoting United States v.

Kimbell Foods, Inc., 440 U.S. 715, 728 (1979)).  Although the conflict need not be as absolute as that which is required under ordinary preemption analysis where Congress has legislated in an area traditionally governed by state law, "conflict there must be."  Id. at 508.  In the absence of a conflict, state law obligations remain in effect.  Thus, if:

> the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary.  The contractor could comply with both its contractual obligations and the state-prescribed duty of care.  No one suggests that state law would generally be pre-empted in this context.

Id. at 509.

In the case presented in Boyle, however, the Court recognized the potential for the finding of a "significant conflict."  Id. at 511.  Neither the federal government nor its officers could be sued for designing an unsafe and defective helicopter because of an inadequate escape hatch, for the Federal Tort Claims Act ("FTCA") precluded the imposition of liability for "the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a).  The Court in Boyle therefore reasoned that, if the federal government could not be sued for performing discretionary acts, neither could a private contractor, and any state law providing for such liability would necessarily give rise to an inherent conflict.  On the basis of such a significant conflict, Boyle held, the imposition of liability pursuant to state law must fail where: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  Boyle, 487 U.S. at 512.

Boyle ruled that there was a unique federal interest implicated in the securing of military procurement contracts.  The rule of Boyle, however, is more expansive and extends to other fields of strong federal interest.  The dispositive issue is "whether there is a uniquely federal interest in the subject matter of the contract." Richland-Lexington, 854 F. Supp. at 422.  Thus, in Richland-Lexington, the District Court for South Carolina extended federal immunity to a private contractor hired by the Environmental Protection Agency to cleanup and stockpile contaminated soil.  Id. 423-24.  Applying Boyle, the court ruled that the actions of the EPA were discretionary in nature, and that the discretionary function exception of the FTCA operated to prevent it and its employees and officials from being sued.  Id. at 423.  The court then applied Boyle's three-prong test, and concluded that state law conflicted insofar as it operated to impose liability on a private contractor hired by the EPA and therefore was displaced. First, the court found that the EPA had approved the site for cleanup, had determined the best method for cleanup, and had hired the defendant contractor to excavate and remove contaminated soil from the site according to that method.  Second, the court found that the defendant contractor had performed pursuant to performance specifications issued by the EPA and under the EPA's supervision.  Third, the court found that the defendant contractor had not been aware of any dangers with respect to the cleanup activity as to which the EPA was not also aware.  Id. at 423-24.  The court concluded that state tort law was displaced and the defendant contractor was therefore immune from suit, sharing in the immunity traditionally granted the federal government. Id. at 424.

The crucial element is that the government contractor acted in

compliance with "reasonably precise specifications" approved by the United States.

Boyle, 487 U.S. at 512.  The very essence of the defense is to "prevent the contractor

from being held liable when the government is actually at fault," Trevino, 865 F.2d at

1478, for "[w]hen a contractor acts under the authority and direction of the United States,

it shares in the immunity enjoyed by the Government."  Zinck, 690 F. Supp. at 1333

(citing Yearsley, 309 U.S. 18).  If, however, the private actor was acting independently of

precise government directions and approvals, the defense does not apply.  Trevino, 865

F.2d at 1480; see also Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir. 1995).

Furthermore, the government must supervise and control the contractor's actions, for if it

does not, or if it fails to exercise supervisory judgment as to the particularities of the

project, state law allowing lawsuits for negligence and federal policy providing for

immunity are not in conflict and displacement of state law may not be warranted.  Tate,

55 F.3d at 1154.  In the latter case, the discretionary functions of the government are not

implicated and the government contractor defense as enunciated in Yearsley and Boyle

may not apply.  Trevino, 865 F.2d at 1480.

> When the government merely accepts, without any substantive review or
> evaluation, decisions made by a government contractor, then the
> contractor, not the government, is exercising discretion.  A rubber stamp is
> not a discretionary function; therefore, a rubber stamp is not 'approval'
> under Boyle.

Id.  Thus, derivative immunity arises where the government:  (a) approves in its

discretion reasonably precise specifications, (b) supervises and controls the

implementation of those specifications, and (c) the contractor is not aware of reasons not

known to the government why the application is unsafe or unreasonable.  Id.  Immunity

will not attach, however, where the private contractor acts, or knows material facts, independently of the federal agency.

2.  Application to the Rescue and Recovery Efforts at Ground Zero

Defendants claim that federal agencies assumed exclusive control over three distinct areas of the rescue and recovery effort following September 11, and that they are therefore entitled to share in the immunity enjoyed by the federal government with respect to all claims arising from those areas.  Specifically, Defendants claim federal control as follows:  (1) the Army Corps assumed control over the design, implementation and enforcement of environmental health and safety monitoring at Fresh Kills; (2) OSHA assumed the lead role for respirator distribution, fit-testing, training and use at and around Ground Zero; and (3) the EPA assumed lead responsibility for environmental monitoring and hazardous waste removal.  The Defendants thus argue that they are entitled to derivative immunity from all claims relating to the health and safety protocols in effect at Fresh Kills; claims relating to respirator distribution, fit-testing and training at and around Ground Zero; and all claims arising from air quality monitoring and hazardous materials removal conducted at the World Trade Center site.

The first step in the Boyle analysis is to identify the unique federal interest.  That lies in the Federal Response Plan ("FRP") which expressly provides for "a process and structure for the systematic, coordinated, and effective delivery of Federal assistance to address the consequences of any major disaster or emergency[.]"  (FRP, Ex. L at 1.)  The Presidential Declaration of a National State of Emergency on September 14, 2001 activated the FRP, leading the Army Corps of Engineers, OSHA and the EPA to become involved in the recovery efforts at Ground Zero.

The next step is to identify if a substantial conflict exists between federal policy and application of state law, as "[c]onflict there must be."  Boyle, 487 U.S. at 508. Pursuant to the Stafford Act, a federal agency or employee acting in accordance with the FRP "shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty[.]"  FRP at 8; 42 U.S.C. § 5148.  To the extent the actions challenged were discretionary in nature, allowing for "'second-guessing' of these judgments … through state tort suits … would produce the same effect sought to be avoided" by the Stafford Act and FRP exemption.  Boyle, 487 U.S. at 511.  It would make little sense to immunize the federal agencies and officers from liability for decisions made as to protocols to be followed at the site while at the same time imposing liability on the City and other Defendants simply for abiding by such federally-determined protocols.

The question, however, is whether the same or different conduct is implicated, that is, whether the contractor is merely carrying out that which federal officers chose to do in the exercise of their discretion, under the supervision and control of federal officers, or whether the contractor did something materially different or additional for which they are being sued.  Here, to the extent that the relevant federal agencies did not exercise oversight over Defendants' actions, federal immunity will not operate to protect Defendants from liability by suspending application of state law.  Tate, 55 F.3d at 1154.

On October 1, 2001, and at the request of the City, the Army Corps assumed limited control over operations at Fresh Kills Landfill and, on October 10, 2001, assumed responsibility for "the implementation of a comprehensive health and safety

plan for <u>all</u> personnel working at the landfill site." (Defs.' J.A. Vol. 5, Ex. BJ

(Amendment to 3-COE, Oct. 10, 2001).)  It engaged Phillips & Jordan to develop and

implement the various protocols and procedures for a comprehensive scheme for

managing health and safety at the landfill, including dust control measures and

monitoring compliance with protocols by workers. (Defs.' J.A. Vol. 5, Ex. BK (Phillips

& Jordan Disaster Recovery Group: Experience).)

   However, there has been no showing that the Army Corps exercised a

level of control and supervision over the operations at the Fresh Kills worksite sufficient

to warrant the extension of federal immunity to the City and other Defendants.  To the

contrary, the record suggests that the City continued to exercise an independent degree of

supervisory control over operations.  It was the DDC, and not the Army Corps, that

designated Fresh Kills as one of the zones of the rescue and recovery effort.  It was the

City, not the Army Corps, that commissioned the Environmental Health and Safety Plan

("ES&H"), first distributed in October of 2001, to address the implementation of health

and safety protocols within the four primary zones constituting the former site of the

World Trade Center and surrounding areas, and which addressed itself to the issues of

worker safety at Fresh Kills, incorporating the more extensive recommendations by

Phillips & Jordan and placing such recommendations on file with the DDC.

   The mere fact that a federal agency, rather than a private contractor,

assumed responsibility for operations within the Fresh Kills zone does not require that

immunity automatically attach.  Although the Plaintiffs cannot "second-guess" the

reasonableness of the Army Corps' recommendations, the Plaintiffs are not precluded

from attacking other aspects of the operations which were outside the direction of the

Army Corps, directly or through Phillips & Jordan, or which were not part of the work that the Army Corps supervised and controlled.[22]  Indeed, the clear understanding was that the Army Corps, far from assuming authoritative control over operations at Fresh Kills, worked "on an as required basis" as the City of New York requested its assistance. (Pls.' J.A. Vol. 4, Ex. 49.)

As to OHSA, within days of the September 11 attacks, and at the request of the City DOH, OSHA became the "lead agency for distributing, fitting, and training for respirators for the recovery of workers."  (Defs.' J.A., Vol. 2, Ex. Q (Clark Dep.) at 87:19-88:6; Pls.' J.A. Vol. 4, Ex. 56.)  OSHA selected the type of respirators to be distributed, and coordinated the distribution of respirators at huts set up throughout the World Trade Center site, providing respirator-fit and -use training, including a mandatory 10-hour health and safety course for all individuals working in a supervisory role at the site.  Further, to ensure compliance with established standards, OSHA deployed over 1,000 inspectors to the site to supervise the work of the Primary Contractors and to document violations.

And yet, despite its designated position as the lead agency for respirator training and use, the record clearly shows that OHSA continued to work in an advisory capacity, providing assistance only as needed and requested by the City.  Throughout the recovery effort, the City DOH continued to act as the agency responsible for the development of job and site-specific PPE requirements, including establishing relevant respiratory requirements.  The ES&H Plan clearly sets out the DDC, with the assistance

---

[22] It should be noted that nothing in the FRP, pursuant to which the Army Corps assumed its role at Fresh Kills, supposes that reliance on federal assistance and resources serves to divest a local authority of control. (See FRP, Ex L ("The combined emergency management authorities, policies, procedures, and resources of local, State, and Federal governments as well as voluntary disaster relief organizations … constitute a national disaster response framework for providing assistance following a major disaster or emergency.").)

of other City agencies and the Primary Contractors, as having primary responsibility for environmental safety and health at the site.  Moreover, OSHA expressly declined to assume an enforcement role at the site, instead limiting its inspectors to reporting any observed violations to the relevant Primary Contractor.  Enforcement was thus left to City agencies and the Primary Contractors.  The cooperative relationship between OSHA and City agencies was memorialized in the WTC Emergency Project Partnership Agreement, affirming "the value of working in a cooperative, focused and voluntary effort to ensure a safe and healthful environment for everyone involved[.]"  (Defs.' J.A. Vol. 3, Ex. AO.)

The EPA also played an important and vital role in the rescue and recovery efforts at Ground Zero.  Like OSHA, the EPA assumed its role at the site pursuant to a direct request by the City and pursuant to the authority granted the agency under the FRP.  Specifically, the EPA assumed lead responsibility for the removal of hazardous materials at the site and for monitoring and reporting on atmospheric conditions.  Air monitoring at the site was coordinated with OSHA and relevant City agencies through the use of air monitors stationed at locations in and around the World Trade Center site.  At the same time, the City, through its own agencies, continued to conduct its own tests, independent of federal air quality monitoring.  Both the City and the EPA shared their data with the inter-agency Environmental Assessment Group.  Determinations as to respirator requirements on the basis of test results, in turn, were made, not by the EPA separately, but rather by the Environmental Assessment Group as a collective group.

The record thus shows that the City never abandoned its overall

responsibility for worker health and safety.  The EPA expressly acknowledged that it lacked the authority to enforce the worker health and safety policies for non-EPA employees.  Moreover, even though the EPA had assumed lead responsibility for the removal of toxic waste at the site, it in fact exercised its authority in conjunction with the City DEP.   (Pls.' J.A. Vol. 4, Ex. 49 ("The Environmental Protection Agency (EPA), in conjunction wit the City Department of Environmental Conservation, (DEP) is responsible for recovering, handling and disposing hazardous wastes at the disaster site.").)  Thus, like the Army Corps and OSHA, the EPA operated at the site in an advisory capacity only, never divesting the City of its authority or its duty to protect those working at its behest.

Defendants urge that active participation of the federal agencies in developing protocols for health and safety suffices to extend immunity.  But this is not so.  The essential purpose of the derivative immunity doctrine is to "prevent the contractor from being held liable when the government is actually at fault[.]"  Trevino, 865 F.2d at 1478.  If the private actor acted in compliance with "reasonably precise specifications" established by the federal agency, and under the supervision and control of the federal agency, immunity is extended.  Boyle, 487 U.S. at 512.  But immunity is not extended where the private actor acts independently, or outside of, or in addition to, the government's specifications.  Moreover, the safety of the workplace is heavily regulated by New York state labor law, a subject that I developed in Hickey, and to which I return in the next section.  Unless adherence to the requirements of the labor law conflicts with federally-developed protocols, the state regulation is not ousted by the federal interest.  Id. at 509.

Here, the record does not show exclusive federal control.  The record instead presents a picture of cooperation and collaboration, with federal agencies providing assistance pursuant to the request of the City and expressly declining to assume an enforcement role, deferring instead to the City agencies and the Primary Contractors. The City and the Primary Contractors it engaged exercised supervisory responsibility for worker health and safety at the site and for ensuring compliance with applicable safety standards.  The exercise of discretionary functions by the federal agencies did not conflict with a continuing obligation by Defendants to abide by the mandatory laws regulating the health and safety of the workplace.

It is beyond any doubt that the City and other Defendants relied upon the assistance and expertise of the federal agencies.  To the extent that reliance, and adoption of federal standards and protocols is shown, and the Defendants' conduct is tantamount to actions by the federal authority, the Defendants enjoy the same immunity as would be conferred on discretionary acts and decisions of federal officers and employees.  At this point, however, the record is not sufficiently clear to enable the court to demark the boundary between federally instructed discretionary decisions, and those made by the various Defendants.  There are material, triable issues of fact that will have to be resolved. At his point in the pre-trial proceedings, the Motions for Summary Judgment are denied.

## C.  Stafford Act Immunity

The various Defendants separately assert immunity pursuant to the Stafford Act.  42 U.S.C. § 5148 (2006).  The Stafford Act provides that the federal government, "shall not be liable for any claim based upon the exercise or performance of

or the failure to exercise or perform a discretionary function on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions" of the FRP.  42 U.S.C. § 5148.  I decline, however, to extend the grant of immunity provided by the Stafford Act to non-federal actors beyond the limits of federal common law, for to do so would extend the Act beyond its plain terms.

Nothing in the plain language of the Stafford Act provides that immunity should be extended to non-federal actors.  The mere fact that non-federal actors may participate in response and recovery efforts does not in and of itself require that immunity be extended to actors not included in the statutory provision of immunity.  Indeed, "this court is not at liberty, because it thinks the provisions [of a statute] inconsistent or illogical, to rewrite them in order to bring them into harmony with its views as to the underlying purpose of Congress."  Helvering v. New York Trust Co., 292 U.S. 455, 472 (1934).  That the Stafford Act's immunity provision should not be judicially rewritten is further underscored by the doctrine of derivative federal immunity otherwise available (and previously discussed).

Immunity provisions are to be interpreted narrowly.  Abbott, 245 N.E.2d 388.  Our system of justice is premised on accountability, save for specific exceptions based on statute or fundamental common law principles of necessity.  Defendants urge that courts should encourage private actors to enlist in recovery efforts from mass disasters, but the same policy has to be sensitive to the individual workers who risk their lives.  The job of restoring society cannot be based on a system rewarding businesses, but being indifferent to the health and welfare of working people.

### D. Other Bases for Federal Immunity

The Port Authority and the World Trade Center Defendants, as well as Con Ed, present additional arguments for immunity under federal law.

The Port Authority and the World Trade Center (Silverstein) Defendants argue that the federal government's promise to pay 100 percent of all costs associated with the rescue and recovery efforts at Ground Zero makes the federal government the real party in interest, thus mandating the dismissal of all claims as against them.   They cite to the Presidential Declaration of National Emergency on September 14, 2001, by which President Bush ordered FEMA to pay all costs associated with the efforts taken in response to the September 11 attacks.   Such promise of payment, however, does not operate to suspend ordinary rules of rights and obligations running between a tortfeasor and his alleged victim.  The question properly before me by these pending motions is whether Defendants are in some manner entitled to immunity for acts undertaken in response to the September 11 attacks.  That Defendants may ultimately seek indemnification from the federal government on the basis of FEMA's alleged obligation to pay 100 percent of costs is irrelevant to this larger question.

Con Ed's additional argument, additional to arguments of derivative governmental immunity and the Stafford Act, is based on its legal responsibility to restore energy to lower Manhattan.  As a public utility, Con Ed argues that it performs a vital function of government, and it should be immune.  Since the claims against Con Ed are dismissed on other grounds, as discussed in the next section, I decline to rule on its argument of immunity.

**VII. THE MOTIONS BY THE LESSEES**

Con Ed and the Silverstein Defendants (collectively the "Lessee Defendants") move for summary judgment, Fed. R. Civ. P. 56(c), dismissing all claims against them on the ground that they were divested of their leasehold interests during the duration of the recovery and cleanup efforts at the World Trade Center and thus may not be held liable for injuries sustained during the course of such efforts.

As the City established control over the World Trade Center site and surrounding areas in the moments following the September 11 attacks, those entities holding an interest in properties at the site found themselves displaced, barred from reentry absent express approval by the City. Plaintiffs seek now to impose liability on two former entities holding an interest in properties at the World Trade Center, Con Ed which operated substations beneath Seven World Trade Center and the Silverstein, or World Trade Center, Defendants, lessees of various properties at the World Trade Center, including One, Two, Four, Five, and Seven World Trade Center. At oral argument on June 22, 2006, I ordered Plaintiffs to submit further briefing as to the veracity of claims pending against the Lessee Defendants. In particular, I directed that Plaintiffs should specifically name and identify individual Plaintiffs who worked under the control of the World Trade Center Defendants or Con Ed during the rescue and recovery efforts at the World Trade Center site and surrounding areas.

By their supplemental submissions, Plaintiffs continue to urge that the claims pending against the Lessee Defendants should be allowed to continue, that these Defendants exercised the degree of control required under applicable law and owed Plaintiffs a duty to provide adequate protective equipment and enforce appropriate safety

standards.  Specifically, Plaintiffs assert claims under New York Labor Law sections 200

and 241(6), General Municipal Laws section 205-a and 205-e, and on the basis of

common law negligence.

### A. *The Work Performed by the Lessee Defendants*

#### 1. The Work Performed by Con Edison

Pursuant to a lease with the Port Authority, Con Edison operated two

electronic substations adjacent to and beneath what would ultimately become Seven

World Trade Center.  7WTC, 2006 WL 62019.  These two substations were essential to

the electrical supply of the City, providing the sole source of electricity for approximately

two-thirds of lower Manhattan.  (See Donahue Aff. ¶ 10, Mem. of Consolidated Edison

Supp. M. for SJ, dated Feb. 17, 2006 at 6.)  On September 11, 2001 Seven World Trade

Center collapsed, after burning unimpeded for several hours, destroying the Con Ed

substations.  7WTC, at * 1.

Following the collapse of the first tower, at approximately 10:25 a.m., Con

Ed evacuated its personnel from the World Trade Center site.  (Rysavy Aff., Ex. DK.)

When the substations were subsequently destroyed, Con Ed immediately set about

notifying all relevant authorities that the destruction may have resulted in the release of

potentially toxic substances.[23]  (See Rysavy Aff., Ex. DZ, EA.)  However, essentially

from the time of the collapse until the turnover of control of Seven World Trade Center to

the Port Authority in May of 2002, access to the site by Con Ed personnel was highly

---

[23] Con Ed notified, among other government entities, the New York City Office of Emergency
Management, the National Response Center, the New York City Department of Environmental Protection,
the New York State Department of Environmental Conservation, the New York City Fire Department,
Marine Division and Bureau of Operations, the New York City Department of Environmental Protection
Right to Know, the New York Public Service Commission, and the United States Coast Guard Post of New
York.  (See Louie Aff., ¶¶ 8, 9, 10 and 11; Rysavy Aff., Ex. DZ.)

restricted.  Indeed, within mere moments of the attacks, the World Trade Center site, including Seven World Trade Center, was placed under the control of the City and access was denied to all but authorized persons.  (See Louie Aff. ¶ 15; Donohue Aff. ¶ 29; Rysavy Aff., Ex. DQ.)  Con Edison could not access the site for any purpose whatever without first obtaining the written approval of the Port Authority and the DDC.  (See Louie Aff. ¶ 16.)

Access was granted to the site and the surrounding area for limited purposes.  On November 30, 2001, the Port Authority allowed Con Edison to enter the site for the purpose of conducting an environmental impact assessment at the order of the New York Department of Environmental Conservation ("NYDEC").  (Louie Aff. ¶; Rysavy Aff., Ex. EB.)  None of the Plaintiffs worked for the subcontractors who conducted the assessment, and thus no claim is alleged against Con Ed with respect to that activity.

By law, Con Ed was responsible to restore electric, gas, and steam services to lower Manhattan.  N.Y. Pub. Serv. Law §§ 65, 79 (McKinney 2006) ("Every gas corporation, every electric corporation, [every steam corporation] and every municipality shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable."); N.Y. Comp. Codes R. & Regs. tit. 16, § 13.13 (2006) (public utilities "shall act promptly to restore service as soon as possible after [emergency] disconnection…"); Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. § 2621(d)(6) (2005).  In order to discharge its responsibility, Con Ed had to build a new substation at the site of what was once Seven World Trade Center.  (Donahue Aff. ¶ 23; Rysavy Aff., Ex. DT, DR, DS, DU, DV, DP.)

Rebuilding of the structure, along with the office building at that site began shortly after the return of control to the Port Authority on May 10, 2002, and was completed on April 3, 2003.  (Louie Aff. ¶ 25; Rysavy Aff., Ex. DX.)  The new substation went back online May 26, 2004, fully restoring power to lower Manhattan.  Work at the site was performed by Tishman Construction through subcontracts with Seasons Contracting and Urban Foundation Engineering.  (See Pls.' Supp. J.A., Ex. 188 (contract between Tishman and Seasons dated May 6, 2006)).  Langan Engineering and Environmental Services performed environmental monitoring for the project through separate subcontracts with Silverstein Properties, as the managing agent of 7WTC, and Con Edison.  (Louie Aff. ¶ 25; Rysavy Aff., Ex. DX.)  Nevertheless, Con Ed's contract with Langan for environmental services was not executed until March 11, 2005, well after work relevant to Con Ed had been completed at Seven World Trade Center.  (Donahue Aff. ¶ 36; Louie Aff. ¶ 27.)

### 2. The Work Performed by the Silverstein Defendants

The Silverstein Defendants—the lessees, managers and operating agents of several properties at the World Trade Center site—were also excluded from these property interests following the September 11 attacks.  Their personnel were allowed to enter the area only upon express authorization from the City.  (See WTC Defs.' Mot. S.J., dated Feb. 17, 2006, at 3.)  Limited access was first granted to the Seven World Trade Center site in May 2002, when control was returned to the Port Authority.  Access to the areas of the site where One, Two, Four and Five World Trade Center had once stood was not granted until July 1, 2002.  See Diversified Carting, Inc. v. The City of New York, 2006 WL 147584, at *1 (S.D.N.Y. Jan. 20, 2006).  The Silverstein Defendants exercised

no control or authority over the general conduct of rescue and recovery operations at the

World Trade Center.  See id.  ("The Silverstein Entities had no control over the debris-

removal activities, nor did they fund the clean up.").

In November 2001, when debris removal operations at Seven World Trade

Center had been completed, the NYDEC gave permission to the Silverstein Defendants to

remove the two diesel fuel tanks that formerly were part of Seven World Trade Center

and the surrounding contaminated soil, in order to begin construction of a new office

tower.  The Silverstein Defendants, in turn, contracted with contractors Turner and Plaza

for the removal of the tanks and soil.  (See Levy Aff. ¶ 7; J.A., Ex. DE.)  The work was

subsequently completed in March and April 2002, prior to the turnover of control from

the City to the Port Authority.  (See Levy Aff. ¶¶ 7, 8; J.A. Ex. DE.)

B.  *Plaintiffs' Supplemental Submissions*

Plaintiffs challenge the showings by Con Ed and Silverstein, and contend that

they remained in control of the World Trade Center premises.  Plaintiffs rely on seven

supplemental affidavits.  I granted leave to Plaintiffs to file such supplemental affidavits

even though they gave no excuse why they had neglected during the deposition

proceedings to identify these individuals as potential witnesses, or why their affidavits

had not been submitted as part of their opposition papers.

Of the seven, Dean Curti states that he worked as a laborer at the World

Trade Center site from late October 2001 through early December 2001, primarily at

Seven World Trade Center, that he was employed by Seasons Construction Company, a

subcontractor to contractors Plaza and Turner, and that he observed Con Ed personnel at

the Seven World Trade Center site in early December 2001 and Silverstein personnel at

the site every day of his employment.  Michael Clarke states that he worked at the Seven World Trade Center site as a crane operating engineer for Seasons from September 12, 2001 through mid-November 2001, and does not mention seeing any personnel of Con Ed or of Silverstein.  Peter Vincent states that he worked as a supervisor of trucking at the World Trade Center site from September 12, 2001 until December 2001, primarily at Seven World Trade Center, and that in his second week at work (approximately the end of September) he observed Con Ed personnel dressed in hazard suits with full respiratory protection working on removing Con Ed's transformers.  Robert Von See states that he worked at the World Trade Center site for approximately two months, beginning September 18, 2001, initially for Bovis and subsequently for Canron Steel Erectors at the South Tower, that he worked for Seasons Construction at the Seven World Trade Center site on September 25, 2001 and that he observed Con Ed Personnel at the site.  Patrick D'Allegro states that he worked for Seasons as a labor-mechanic at the Seven World Trade Center site from September 14, 2001 until early July 2002, and that he saw Con Ed personnel at the site during the first three months after September 11.  He does not mention seeing any Silverstein personnel.  Michael Moscato, Sr. states that he worked as an operating engineer for Seasons at the Seven World Trade Center site from September 13, 2001 until November 2001, that Seasons was a subcontractor for N.Y. Crane to remove the burned and destroyed Con Ed transformers from the site, and fails to mention seeing either Con Ed personnel or Silverstein personnel at the site.  William Moscato states that he worked at the Seven World Trade Center site as an operating engineer for Seasons from September 11, 2001 until the first week of December 2001 and that he

observed Con Ed personnel at the site, but makes no mention of seeing any Silverstein personnel.

Plaintiffs' allegations, that some of them observed Con Ed and Silverstein personnel at the site are conclusory, and without evidentiary effect in relation to Defendants' motions.  No Plaintiff offers any testimony that Con Ed or Silverstein assumed any operational control of the workforce at the site.  There is no evidence that either enjoyed any aspect of the use of the premises that would be characteristic of a landholding, either as a landlord or as a tenant.  In contradiction to their affidavits, Dean Curti and Robert Von See have not included Con Ed as a defendant in their individual complaints, even though they now claim that they saw Con Ed personnel at the job site. None of the seven affiants alleged in their complaints that they had worked at the Seven World Trade Center site, also contradicting their supplemental affidavits.  Indeed, Plaintiff Patrick D'Allegro filed three prior complaints, and only now, in his supplemental affidavit, does he allege that he worked at the Seven World Trade Center site after November 2001.

I hold that there is no credible evidence to show that Con Ed or Silverstein had use of their respective premises, or even general access to them, during the relevant periods of time claimed by any Plaintiff.  Nevertheless, I address below Plaintiffs' asserted bases for liability, finding that, regardless of the veracity of the allegations against Defendants, claims against Con Ed and Silverstein may not stand.

C.  *Alleged Grounds of Liability*

Plaintiffs assert claims against Con Ed and the Silverstein Defendants under sections 200 and 241(6) of New York Labor Law, sections 205-a and 205-e of the

New York General Municipal Law, and state common law.  (See Amended Master

Complaint Against Consolidated Edison, dated Aug. 18, 2006, ¶¶ 103-138; Amended

Master Complaint Against World Trade Center Defendants, dated Aug. 18, 2006, ¶¶ 94-

127.)  Plaintiffs fail, however, to establish that the Lessee Defendants, in their capacity as

lessees, owed any duty towards Plaintiffs, and their claims therefore must be dismissed.

    1.  Dismissal of Claims Pursuant to New York Labor Law for Failure to
        Show the Necessary Degree of Ownership or Control

Counts One and Two of Plaintiffs' Amended Complaints allege violations

of New York Labor Law sections 200 and 241(6).

The common law duties traditionally owed by landowners, general

contractors, and in very limited circumstances, lessees, to maintain and provide a safe

workplace are codified in New York Labor Law section 200.  N.Y. Lab. Law § 200

(2006).  See Ross v. Curtis-Palmer Hydro Elec. Co., 618 N.E.2d 82, 87 (N.Y. 1993).

Section 200 provides, in relevant part, as follows:

> All places to which this chapter applies shall be so constructed, equipped,
> arranged, operated and conducted as to provide *reasonable and adequate
> protection to the lives, health and safety* of all persons employed therein or
> lawfully frequenting such places.  All machinery, equipment, and devices
> in such places shall be so placed, operated, guarded, and lighted as to
> *provide reasonable and adequate protection* to all such persons.

N.Y. Lab. Law § 200(1) (emphases added).

However, liability under this provision is dependent on a showing that the

person or entity to be charged has exercised supervisory control, whether as an owner,

lessee or contractor.  See id. at 88.  Recovery may not be had "unless it is shown that the

party to be charged exercised some supervisory control over the operation."  Ross, 618

N.E.2d at 88 (citing Lombardi v. Stout, 604 N.E.2d 117, 119 (N.Y. 1992); Kappel v.

Fisher Bros., 6th Ave. Corp., 355 N.E.2d 305, 306 (N.Y. 1976)).  Such limitation of

liability stems from "the basic common-law principle that 'an owner or general contractor

[sh]ould not be held responsible for the negligent acts of others over whom [the owner or

general contractor] had no direction or control.'"  Ross, 618 N.E.2d at 88 (quoting Allen

v. Cloutier Constr. Corp., 376 N.E.2d 1276, 1278 (N.Y. 1978)).  Liability in the absence

of direction or control over the worksite may attach only where the person to be charged

in fact caused the defective condition giving rise to injury.  See Murphy v. Columbia

Univ., 773 N.Y.S.2d 10, 13 (N.Y. App. Div. 2004) (holding that proof of control was not

required where the "injury arose from the condition of the work place created by or

known to the contractor[.]").

      Here, the record demonstrates clearly that Con Ed and the Silverstein

Defendants exercised no control over those aspects of the rescue and recovery efforts at

the World Trade Center that gave rise to the injuries claimed by the Plaintiffs.  Both Con

Ed and the Silverstein Defendants had been divested of control over their leasehold

interests immediately following the September 11 attacks, reentering the site only with

the City's permission and for limited purposes.

      The Silverstein Defendants, as the managing agent for the lessee of Seven

World Trade Center, contracted with Turner and Plaza for the removal of two diesel fuel

tanks and soil at the site between March and April of 2002.  (See Levy Aff. ¶ 7; J.A., Ex.

DE.)  But there has been no showing that the Silverstein Defendants in fact exercised

control over the work performed by Turner and Plaza.  The evidence in the record is that

the DDC exercised that supervisory control.  Although Patrick D'Allegro asserts in his

supplemental affidavit that he "often saw Silverstein personnel in hard hats walking in

and around the worksite," (Pls.' Supp. J.A., Ex. 195 at ¶ 9) that bare assertion is not enough to establish liability under section 200.  See Ross, 618 N.E.2d at 88 (quoting Allen, 376 N.E.2d at 1278).

Con Ed's role at the site following September 11 was limited to its participation in a mandated environmental impact assessment and its role in the rebuilding of the substation at Seven World Trade Center.  Plaintiffs concede that no claims arise from the conduct of the environmental assessment.  As to the rebuilding of the substation, all work was performed pursuant to a contract between Tishman and Seasons dated May 2006.  Aside from deposition statements by Eddy Louie, section manager in Con Ed's Environmental Health and Safety Department, providing generally that Con Ed at some point distributed respirators to Con Ed employees and others at the site, (see Pls.' J.A., Ex. 154 at 104-108) there is simply no evidence whatsoever that Con Ed exercised any control over the work performed by Tishman, Seasons, or any other contractors working at the site, and no Plaintiff cited that alleged distribution as the basis of any claim.  Only affiant D'Allegro claims to have worked at Seven World Trade Center during the time in which Tishman and Seasons performed work pursuant to a contract with Con Ed, and D'Allegro's assertion that he "saw Con Edison personnel on and off within the first three months after September 11, 2001," (Pls.' Supp. J.A., Ex. 195) fails to establish the requisite involvement needed to impose liability under section 200.

Plaintiffs argue that, because Con Ed was aware of the dangerous conditions at the worksite arising from the release of potentially toxic materials when the substation was destroyed, and gave notice thereof to all responsible agencies, liability

must attach even in the absence of a showing of control.  See Murphy, 773 N.Y.S.2d at

13.  Plaintiffs' argument is without merit.  The record clearly demonstrates that Con Ed

immediately warned all relevant authorities of the potential dangers resulting from the

destruction of the substation, and that it was thereafter divested of any control over the

conduct of the rescue and recovery efforts.  To impose liability here would go beyond the

requirements of the Labor Law.

        Plaintiffs' claims under section 241 of the New York Labor Law

must fail also.  Section 241 further codifies the obligations of owners and contractors to

ensure workers' safety.  Section 241(6) specifically provides that:

> All contractors and owners and their agents … when constructing or
> demolishing buildings or doing any excavating in connection therewith,
> shall comply with the following requirements:
>
>           ***
>
> 6.  All areas in which construction, excavation or demolition work is being
> performed shall be so constructed, shored, equipped, guarded, arranged,
> operated and conducted as to *provide reasonable and adequate protection
> and safety to persons employed therein* or lawfully frequenting such
> places.  The commissioner may make rules to carry into effect the
> provisions of this subdivision, and the owners and contractors and their
> agents for such work … shall comply therewith.

N.Y. Lab. Law § 241(6) (2006) (emphasis added).

        The duty imposed under section 241(6) may not be delegated.  See Ross,

618 N.E.2d at 87.  Thus, consideration of whether the defendant exercised control or

supervision over the worksite is irrelevant.  See id.  However, because section 241(6)

essentially provides for strict liability, courts are reluctant to extend such liability to mere

lessees of property.  Indeed, although lessees may be subject to liability under section

241(6), liability may not attach where the lessee is out of possession, does not contract

for or supervise the work, and lacks any authority to control or direct the work which

caused the injury.  See Crespo v. Triad, Inc., 742 N.Y.S.2d 25, 29 (N.Y. App. Div. 2002)

(holding that out-of-possession lessee was not liable under section 241(6) where it neither

contracted for nor supervised the work) (citing Saaverda v. East Fordham Rd. Real Estate

Corp., 649 N.Y.S.2d 416, 417 (N.Y. App. Div. 1996) (affirming grant of out-of-

possession lessee's motion for summary judgment on basis that lessee did not contract for

or supervise the challenged work and had no authority to exercise control over the

worksite)).  A lessee may be considered the equivalent of an owner for purposes of

section 241(6) only where it was the lessee, and not the owner, who engaged a contractor

to undertake construction work for the lessee's benefit.  Copertino v. Ward, 473 N.Y.S.2d

494, 496-97 (N.Y. App. Div. 1984).  Section 241(6) requires a finding "that the party to

be cast in the role of 'owner' had the 'right to insist that proper safety practices were

followed and it is the right to control the work that is significant.'"  Bateman v.

Susquehanna Valley Cent. Sch. Dist., 734 N.Y.S.2d 704, 705-06 (N.Y. App. Div. 2001).

   The record here shows clearly that neither Con Ed nor the Silverstein

Defendants, as lessees of property interests at the World Trade Center site, possessed the

control necessary to impose liability under section 241(6).  Although both contracted for

work to be performed at Seven World Trade Center in the Spring of 2002, a lessee may

not be held liable merely on the basis of a contract running between it and a general

contractor.  Clear proof must be provided that the lessee in fact had the "right to control

the work."  Bateman, 734 N.Y.S.2d at 705-06.  Here, no such proof was presented.

Indeed, the only affiant who even claims to have worked at Seven World Trade Center in

the period during which Con Ed and the Silverstein Defendants contracted for work to be

performed, Patrick D'Allegro, states only that he observed Con Ed and Silverstein

personnel at the site.  This is an insufficient basis for liability under section 241(6).  As

such, the claims against Con Ed and the Silverstein Defendants pursuant to section 241(6)

are dismissed.

> 2.  <u>Dismissal of Claims Sounding in Negligence in the Absence of Any Duty Owed</u>

Plaintiffs assert liability also on the basis of statutory and common law

negligence.  Counts Three and Four of the Amended Complaints assert negligence claims

on behalf of firefighters, N.Y. Gen. Mun. L. § 205(a), and police officers, N.Y. Gen.

Mun. L. § 205(e).  Count Five is premised on common law negligence.

In the absence of a duty of care, liability in negligence may not attach.

<u>See</u> <u>Palsgraf v. Long Island R.R. Co.</u>, 162 N.E.2d 99 (1928).  The scope of the duty

owed, in turn, is a "legal issue for the court to resolve."  <u>7WTC</u>, 2006 WL 62019, at * 14

(<u>citing</u> <u>Waters v. New York City Housing Authority</u>, 505 N.E.2d 922, 923 (N.Y. 1987)).

Whether a duty in fact exists is determined by consideration of several factors including:

(a) whether the relationship is such that it gives rise to a duty of care; (b) whether the

plaintiff is within the zone of foreseeable harm; and (c) whether the accident was within

the zone of reasonably foreseeable risks.  <u>See</u> <u>7WTC</u>, 2006 WL 62019, at * 14.  Critical

for the purposes of this analysis is whether the relationship running between the Lessee

Defendants and the Plaintiffs is sufficient to give rise to a duty of care.  It is well

established that landowners, and persons with an interest in property, "owe a duty to

persons on their property to protect them from harm arising from conditions on the

property."  <u>Id.</u> at *15 (citations omitted).  The duty owed by the landowner, however, is

not absolute.  Where the landowner or person with a property interest has been divested

of control over the property, liability may not be found.  See Kilmer v. White, 171 N.E. 908, 909 (N.Y. 1930) ("One's liability in negligence for the condition of land ceases when the premises pass out of one's control before injury results.").

Here, as the discussion above demonstrates, the Lessee Defendants were immediately divested of control over their leasehold interests and were entirely denied access to their properties absent express authorization by the City and Port Authority. Moreover, any work performed in the months following the September 11 attacks was not performed under the direct control or approval of the Lessee Defendants.  Having been so divested of control, liability may not now attach.

In the absence of such a duty of care running between the Lessee Defendants and the Plaintiffs, the claims asserted under New York General Municipal Law, sections 205(a) and 205(e), must also fail.  Sections 205(a) and (e) of the General Municipal Law impose liability for a plaintiff firefighter's or police officer's injury or death which is caused, either directly or indirectly, by the defendant's "neglect, omission, willful or culpable negligence" in failing to comply with applicable "statutes, ordinances, rules and requirements[.]"  N.Y. Gen. Mun. L. §§ 205(a), (e).  In order to defeat a motion for summary judgment, a plaintiff asserting claims under these provisions of the General Municipal law must: (1) identify the statute which the defendant allegedly violated; (2) detail the manner in which the plaintiff sustained injury; and (3) set out the facts from which it may be inferred that the defendant's negligence directly or indirectly caused the plaintiff's injury.  See Zvinys v. Richfield Investment Co., 2006 WL 20805, at *1 (N.Y. App. Jan. 5, 2006).  Here, in the clear absence of any duty owed by the Lessee Defendants to Plaintiffs, a claim in negligence under these sections may not stand.  As

such, Plaintiffs' claims against the Lessee Defendants under General Municipal Law

sections 205(a) and (e) must be dismissed.

   3. <u>Dismissal of all Remaining Claims for Failure to Show any Underlying Claim</u>

    Counts Six and Seven of Plaintiffs' Amended Complaints against the

Lessee Defendants assert derivative claims sounding in wrongful death and loss of

consortium.  In the absence of any viable theory of recovery as against the Lessee

Defendants, these claims must also be dismissed.

    In accordance with the foregoing, the claims against the Lessee

Defendants are dismissed with prejudice.

## VIII. CONCLUSION

    For the reasons discussed in the Opinion, the motions by the City and by

the Port Authority to dismiss the complaints against them, and against the contractors

engaged by the City are denied; the motions by Con Ed and the World Trade Center

Defendants are granted, and the complaints against them are dismissed.

    The state and federal statutes that provide immunity protect the remaining

Defendants against suit, but the precise scope and extent of the immunity varies

according to date, place and activity.  As I indicated in the prior sections of this Opinion,

the fact-intensive nature of the issue makes its resolution unsuitable for resolution by

motion.  Discovery, additional proceedings, and a more extensive factual record, and

perhaps a trial, will be required.

    The number of these cases present unusual complexities in these pre-trial

proceedings.  Plaintiffs, we have been told, worked for various contractors, on various

dates, and in different portions of the World Trade Center site.  Many contracting companies worked at the site, performing varying functions, each under separate contract, and each subject to varying supervision by different government inspectors, working for different federal, state and City agencies, and by the primary contractors and higher-level subcontractors.  Although a considerable amount of discovery has taken place in connection with the pending motions, there is much more to come—much, much more.

The needs of the parties, and the public interest, do not permit the leisurely and expensive progression of proceedings that are often characteristic of complex litigation.  If even a minority of the Plaintiffs suffered serious injuries to their respiratory tracts arising from the acrid air of September 11, their claims deserve to be heard when a recovery could make a difference to their lives.  Conversely, if complaints lack merit, or if defenses prove to be valid, defendants are entitled to the earliest possible release.  The availability of a one billion dollar fund authorized by Congress should not serve as encouragement to lengthen and complicate these proceedings.  The scar to the public interest needs to be cleansed, speedily, in good time.

By separate Order, I order various dates for proceeding: when Plaintiffs are to disclose the details of their alleged injuries and where and how they suffered their injuries; where contractors performed their operations, and under what contracts and with whom; and other such matters.  The number of parties, both Plaintiffs and Defendants, make even these basic tasks arduous.  To ease the tasks, develop efficiencies, and begin to prepare a plan for early dispositions of numbers of these cases by settlement or by trials, my Order asks the parties to consider the utility of appointing a Special Master to assist the court and the parties to accomplish these goals.  All of this will be considered in

a conference to be held November 3, 2006, at 2:00 P.M., in Courtroom 14D, United

States Courthouse, Southern District of New York.

SO ORDERED.

Dated:      New York, New York
October ___17, 2006

ALVIN K. HELLERSTEIN
United States District Judge